719 A.2d 284

**COMMONWEALTH of Pennsylvania, Appellee;**

v.

**Dennis COUNTERMAN, Appellant.**

Supreme Court of Pennsylvania.

Argued April 28, 1998.

Decided Oct. 26, 1998.

Reargument Denied Dec. 18, 1998.

374

380

Robert Long, Whitehall, Glenn Matthew Goodge, Allentown, for D. Counterman.

Douglas G. Reichley, Allentown, Robert A. Graci, Office of Atty. Gen., for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

SAYLOR, Justice.

This is a direct appeal from the sentences of death imposed upon Appellant, Dennis Counterman, after a jury returned verdicts of guilt for three counts of murder in the first degree, attempted homicide, two counts of arson, and two counts of intimidation of a witness or victim. We affirm.

The factual background of this case is as follows: Appellant, Dennis Counterman ("Counterman"), resided in a row home in Allentown with his wife, Janet, and their three children:

Christopher, age 6; James, age 4; and Scott, a ten-week-old infant. The family relationship was strained by financial difficulty and Counterman's abusive behavior.

On July 24, 1988, Counterman spent the day smoking marijuana and playing video games. At approximately 2:00 a.m. the following day, he awakened his wife, who was sleeping in an upstairs bedroom. Counterman made sexual advances, but, because Mrs. Counterman disapproved of his use of marijuana, she rebuffed him. Counterman became angry, slapped his wife and went to the first floor of the residence. Later that same morning, Christopher and James entered their mother's bedroom crying and screaming, awakened her, and told her: "daddy is downstairs starting a fire." Mrs. Counterman picked up her baby and, with Christopher and James following, started down the stairs.

From the steps, Mrs. Counterman saw Counterman in the dining room holding a bucket and a cigarette lighter. Counterman stated that if she and the children did not go back upstairs, he would set them on fire. Mrs. Counterman retreated to the second floor, placed her baby in his crib, and directed the two older children to their shared bedroom. Immediately thereafter, flames engulfed the stairway, preventing her egress from the second floor. Mrs. Counterman ultimately escaped from a second story window with the assistance of a neighbor, but she suffered second and third-degree burns that covered fifty percent of her body, respiratory burns, and smoke inhalation.

As the fire burned, Counterman stood in his yard looking at the ground. Upon learning of the fire from Counterman, several neighbors urged him to attempt a rescue of his family. He responded that he was unable because he was not wearing shoes and the fire was too far along. Eventually, Counterman climbed onto the porch roof in the rear of the residence and edged over to a window of the room occupied by Christopher and James. After looking into the window, Counterman turned to retreat from the roof, but lost his footing and fell to the yard below, injuring his leg.

Although firefighters reached the scene relatively quickly, the Counterman residence was fully engulfed by the fire upon their arrival. Nevertheless, the fire was subdued before it spread to neighboring row homes, although the Counterman residence was gutted.[1] Despite their efforts, the firefighters and medical personnel were unable to save the lives of any of the children. Autopsies revealed that the children died from "conflagration," a combination of smoke inhalation and burns from the fire.

Counterman was eventually taken to the Lehigh Valley Hospital Center by Sergeant Kochan of the Allentown Police Department, who had also been injured while assisting with the fire fighting efforts. At the hospital, Sergeant Kochan questioned Counterman about the fire. Counterman stated that he had been sleeping upstairs with his wife when Christopher and James came into the room and told him that there was a fire downstairs, and that he went downstairs and found the couch on fire. He said that he attempted to extinguish the fire by filling a bucket with water from the kitchen sink and throwing it on the fire, but that the smoke caused him to abandon this effort and flee the home through the back door. However, the doctor who examined Counterman at the hospital found no evidence of burns on him, except for a slight singeing of his hair; furthermore, his lung function and blood studies were inconsistent with his assertion of having inhaled smoke. While at the hospital, Counterman was also seen by Jean Hoffman, a medical social worker. In speaking with Counterman, Ms. Hoffman observed that he did not appear to be grieving over the deaths of his children. Counterman also expressed concern over his insurance situation to Ms. Hoffman.[2]

After interviewing Counterman, Sergeant Kochan attempted to interview Mrs. Counterman in the emergency room.

1. In the course of the fire suppression effort, five firefighters were injured.

2. Because Counterman had failed to pay his insurance premium, the policy on his home was set to expire on July 26, 1988, the day following the fire.

Sergeant Kochan observed that Mrs. Counterman did not appear to be entirely coherent. He asked her how she had learned about the fire, to which she responded that Christopher had awakened her. When she was asked by Sergeant Kochan how the fire started, she looked away and did not answer. Sergeant Kochan then asked Mrs. Counterman where her husband had been, to which she responded, "woke him up." At that point, she indicated that there was nothing else she could remember.

While Mrs. Counterman was at the hospital, medical personnel noticed that she did not include her husband on her visitor list. Because of this circumstance, the police requested notification from the hospital if she changed her visitor list. On July 30 and 31 of 1988, Detective James Stephens interviewed Mrs. Counterman, although because Mrs. Counterman was on a respirator and had been orally intubated, she was unable to communicate except by writing or nodding her head. During this interview, Mrs. Counterman indicated that her husband had started the fire with a cigarette lighter. When asked about his motive, she wrote "he wanted." Detective Stephens then asked her whether they had fought, to which she responded, "yes." Mrs. Counterman also told the police that she and her husband frequently quarreled, and that her husband was trying to hurt her and the children.

On August 6, Detective Stephens interviewed Mrs. Counterman again. On this occasion, Mrs. Counterman was able to whisper. She stated that she knew that her husband had a cigarette lighter, because she heard him clicking the lighter downstairs. Mrs. Counterman acknowledged that her earlier statement to Sergeant Kochan, in which she indicated that her husband was in bed with her, was untrue. She also said that she feared her husband, and that he had abused her. She described their fight on the morning prior to the fire. She told Detective Stephens that her children awakened her to tell her of the fire, and that when she went to check on her husband, he shouted at her and told her to go back to bed.

Subsequent to August 6, Counterman spoke to his wife over the telephone and later visited her at the hospital. Because

Mrs. Counterman changed her visitor list to include her husband, hospital personnel notified the police, and she was interviewed again on August 22. During this interview, she related to Officer MacLean a version of events consistent with what her husband had told the police. When Officer MacLean contacted Detective Stephens regarding the change in Mrs. Counterman's story, they decided to speak with her the next day, August 23. At this interview, Mrs. Counterman admitted that she had lied to Officer MacLean the day before and, once again, related to Officer MacLean and Detective Stephens the version of events she had provided in earlier statements. She also told the police that Counterman had threatened her and that she was afraid of him. Immediately after this interview, Counterman was arrested.

During the guilt phase of trial, the Commonwealth presented expert testimony from Deputy Fire Chief Joseph D'Annibale, who expressed an opinion that the fire originated in an area between the refrigerator and a cabinet in the kitchen and dining room. He also concluded from the burn pattern on the stairway and dining room floor that approximately one gallon of liquid accelerant was used in starting the fire. Although no residue of the accelerant was found, Chief D'Annibale reasoned that the fire consumed all such material. Additionally, the Commonwealth presented expert testimony from Martin Wenzler, an insurance investigator, who also probed the cause and origin of the fire. Mr. Wenzler similarly concluded that an accelerant was used, testifying that a highly flammable liquid was poured on the stair area of the Counterman residence, through the dining room, and into the kitchen. Both Deputy Chief D'Annibale and Mr. Wenzler ruled out any mechanical cause of the fire. Because the doors to the Counterman home were locked from the inside, the Commonwealth's experts reasoned that the fire was started by someone inside the home. Based upon the use of a large amount of accelerant and the location of the children, Deputy Chief D'Annibale and Mr. Wenzler concluded that the children did not start the fire.

Counterman testified in his own defense and denied having set the fire. With some inconsistencies, he reiterated the substance of his statements to police that the children had awakened him and his wife, and that he had attempted to extinguish the fire before being forced from the house by smoke. Counterman's defense centered upon the notion that the fire was started by someone else in the house, possibly his children. He presented expert testimony as to the cause and origin of the fire; however, his expert testified that the fire was intentionally set and that it did not originate from the couch.

The jury convicted Counterman of murder in the first degree for the deaths of his three children.

At the penalty hearing, the Commonwealth proffered the three following aggravating circumstances: Counterman committed the killing while in the perpetration of a felony (arson), 42 Pa.C.S. § 9711(d)(6); in the commission of the offense he knowingly created a grave risk of death to other persons, namely, his wife, the neighbors and the firefighters, in addition to the victims of the offense, 42 Pa.C.S. § 9711(d)(7); and he had been convicted of another murder, committed either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11). In mitigation, Counterman offered that he had no significant history of prior criminal convictions. 42 Pa.C.S § 9711(e)(1). He also sought to establish that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, 42 Pa.C.S § 9711(e)(3);[3] that he acted under extreme duress, 42 Pa.C.S § 9711(e)(5); and that the jury could find other evidence of mitigation concerning his character at the time of the offense, 42 Pa.C.S. § 9711(e)(8).

The jury found all three aggravating circumstances and two of the mitigating circumstances, specifically, that Counterman had no significant prior history of criminal convictions, and that his capacity to appreciate the criminality of his conduct was diminished. Finding that the aggravating circumstances

---

**3.** Counterman presented evidence that he had a severe learning disability, which affected his ability to read, comprehend, and express himself.

outweighed the mitigating circumstances, the jury returned with a sentence of death for the murder of each of Counterman's children.

## SUFFICIENCY OF THE EVIDENCE

Although Counterman has not raised a challenge to the sufficiency of the evidence underlying his first degree murder convictions, in all cases in which the death penalty has been imposed, we are required to review the sufficiency of such evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). To establish murder in the first degree, the Commonwealth must prove that the defendant specifically intended to kill, which is established by proof of premeditation and deliberation. *See Commonwealth v. Weinstein*, 499 Pa. 106, 115, 451 A.2d 1344, 1348 (1982). A specific intent to kill may be proven by circumstantial evidence, and no particular period of premeditation is required to form the requisite intent. *Commonwealth v. Williams*, 455 Pa. 539, 546–47, 316 A.2d 888, 891 (1974).

In this case, the Commonwealth established that Counterman's three children died from the effects of the fire. Moreover, Mrs. Counterman testified to the abusive behavior Counterman exhibited during the course of their marriage and prior to the fire, when she rebuffed his sexual advances. She also testified to having seen Counterman in the location where the fire started holding a bucket and a cigarette lighter immediately before the blaze, as well as to Counterman's subsequent threat to set her and the children on fire. The Commonwealth presented testimony from neighbors and bystanders as to Counterman's statements and behavior during the fire, which were inconsistent with his own testimony and evinced a consciousness of guilt. In addition, the Commonwealth offered evidence of Counterman's motives for setting the fire, including the argument with his wife, his financial difficulty, and the fact that the insurance policy on the residence was to expire the day after the fire.

The Commonwealth also presented expert testimony as to the incendiary nature of the fire. The experts for the Commonwealth eliminated all mechanical causes and opined that the fire was set by someone inside the home (as the doors were locked from the inside), but not the children. The fact that the underlying arson was proven, in part, by circumstantial evidence, is of no moment as "proof of guilt, especially in arson cases, may be established [through] circumstantial evidence." *Commonwealth v. DiNicola,* 503 Pa. 90, 96, 468 A.2d 1078, 1081 (1983). The evidence adduced at trial was sufficient to sustain Counterman's convictions for the deliberate and premeditated killing of his three children.

**GUILT PHASE**

**Pretrial Claims**

Counterman raises several issues involving pretrial rulings. Initially, we address his claim that he was entitled to a change of venue or venire. A request for such a change is permitted by Pennsylvania Rule of Criminal Procedure 312 and is required when a fair and impartial jury cannot be selected from a jury pool drawn from the county in which the crime occurred. *Commonwealth v. Stevens,* 543 Pa. 204, 209, 670 A.2d 623, 625, *cert. denied,* — U.S. —, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). The grant or refusal of a change of venue or venire is directed to the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Commonwealth v. Chambers,* 546 Pa. 370, 385, 685 A.2d 96, 103 (1996), *cert. denied,* — U.S. —, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997).

As a general rule, one who claims that he has been denied a fair trial because of pretrial publicity must demonstrate actual prejudice in the empaneling of the jury. *Commonwealth v. Rucci,* 543 Pa. 261, 283–84, 670 A.2d 1129, 1140 (1996), *cert. denied,* 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997). The mere existence of pretrial publicity does not create a presumption of prejudice. *Chambers,* 546 Pa. at 385, 685 A.2d at 103. Similarly, jurors are not required to be totally ignorant of the facts of a case, because in many cases,

given modern methods of communication, it would be impossible to empanel a jury. *Commonwealth v. Romeri*, 504 Pa. 124, 132, 470 A.2d 498, 502 (1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984).

Nevertheless, this Court has held that in certain exceptional circumstances pretrial publicity may be so sustained, pervasive, inflammatory, and inculpatory that the defendant may be relieved of the burden of proving actual prejudice. *Commonwealth v. Frazier*, 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977). In evaluating whether such exceptional circumstances exist, the following factors are determinative: 1) whether the pretrial publicity was inherently prejudicial; 2) whether the pretrial publicity saturated the community; and 3) whether there was a sufficient proximity in time between the publicity and the selection of a jury such that the community from which the jury was drawn did not have an opportunity to "cool down" from the effects of the publicity, thus making a fair trial in such community impossible. *See Romeri*, 504 Pa. at 132–34, 470 A.2d at 502–503. Only when there is proof of each of the above circumstances is a new trial required. *See Commonwealth v. Breakiron*, 524 Pa. 282, 287, 571 A.2d 1035, 1037, *cert. denied*, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990).

Counterman does not contend that the pretrial publicity caused actual prejudice by preventing him from empaneling an impartial jury; rather, he alleges that the pretrial publicity was presumptively prejudicial because it was sustained, pervasive, and inflammatory. Counterman submits that beginning on July 25, 1988, three different radio stations aired accounts of the fire and the subsequent criminal case.[4] Counterman also submitted evidence that the print media

4. In particular, Counterman presented evidence that station WAEB aired stories regarding the fire and the criminal case approximately sixty-three times from July 25, 1988 through November 24, 1988, and that the station reaches approximately 73,000 listeners. In addition, station WKAP broadcast stories regarding the fire and subsequent criminal investigation 21 times from July 25, 1988 through August 24, 1988. That station reaches approximately 468,000 listeners. The remaining radio station, WXKW, aired the events approximately 33 times.

extensively covered the story.[5] The events surrounding the case were also televised by Channel 69 (WFMZ) approximately 16 times,[6] and by Service Electric, apparently also a television station.

In determining whether pre-trial publicity is inherently prejudicial, this Court considers the following factors:

Whether the pretrial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and slanted articles demanding conviction . . .; whether the pretrial publicity revealed the existence of the accused's prior criminal record; whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information [was] the product of reports by the police and prosecutorial officers.

*Romeri*, 504 Pa. at 132, 470 A.2d at 502. Here, the tragic nature of the fire attracted considerable media attention. However, the trial court determined that the news reports were factual and objective.

Secondly, as the trial court pointed out, it is doubtful that the media accounts saturated the community. Nevertheless, even if the news reports were inherently prejudicial and did saturate the community, the bulk of the pretrial publicity occurred between July 25, 1988 and September 24, 1988. The trial in the present matter did not commence until July 29, 1990, approximately eighteen months after the date of the fire and in excess of one year after the majority of the pretrial publicity. Moreover, our review of the fourteen hundred pages of individual voir dire reveals that the prospective jurors either did not recall the incident or, in most cases, had

---

**5.** *The Morning Call* displayed captions that read "Three Boys Killed by Fire," "Man Charged in Sons' Death," and "Homicide Suspect Stuck to Fire Story." *The Globe Times* featured an article titled "Father is Charged in Fatal Fire," and *The Easton Express* printed a story headlined "Man Held in Three Sons' Fire Death." On November 24, 1988, *The Morning Call* printed " 'Daddy's Down Setting a Fire,' Wife Says Victims Scream." Furthermore, on May 3, 1989, *The Morning Call* published various statements allegedly made by Counterman.

**6.** WFMZ–TV was unable to provide information concerning the size of its audience.

only vague recollections of the fire, and could not remember details. *See Breakiron,* 524 Pa. at 288 n. 1, 571 A.2d at 1037 n. 1 (noting that the existence of an adequate cooling off period can be verified by reference to the responses given by the prospective jurors). Thus, there was a sufficient "cooling off" period between the complained of pretrial publicity and Counterman's trial, and the trial court did not abuse its discretion in denying the requested change of venue or venire. *See Commonwealth v. McCullum,* 529 Pa. 117, 127, 602 A.2d 313, 317–18 (1992) (finding that a nine month period between publication of articles and trial was sufficient to dissipate the effects of the pretrial publicity).

Counterman also raised a pre-trial challenge to his wife's competency to testify. This challenge was premised, in part, upon Mrs. Counterman's preliminary hearing testimony, during which she exhibited difficulty in comprehending the questions put to her and in articulating responses. In an effort to support this claim, he sought a court order compelling the disclosure of Mrs. Counterman's psychiatric or psychological treatment records and requested that the trial court require her to undergo a psychiatric examination. During the hearing on the competency challenge, the defense introduced Mrs. Counterman's school records, which reflected that she possessed an IQ that was consistent with a diagnosis of mental retardation. However, there was no evidence that Mrs. Counterman received mental health treatment and, accordingly, no indication that any such records existed. The trial court denied both requests.

Counterman asserts that the trial court's denial of the request for his wife's mental health treatment records violated his Sixth Amendment rights to confrontation and compulsory process, as well as his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution.

■ The information Counterman sought, however, is subject to the following privilege:

**Confidential communications to psychiatrists or licensed psychologists**

No psychiatrist or person who has been licensed ... to practice psychology shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

42 Pa.C.S. § 5944. The psychiatrist/psychologist-patient privilege is based upon a strong public policy that confidential communications made by a patient to a psychiatrist or psychologist should be protected from disclosure, absent consent or waiver. *See Commonwealth v. Fewell*, 439 Pa.Super. 541, 548, 654 A.2d 1109, 1112 (1995).

■ There is no indication in the record that Counterman was denied the right to physically confront his accusers. Indeed, he was present throughout the trial and was able to face his accusers; thus his right to confrontation was not violated. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987) (defining the scope of the right to confrontation). Rather, Counterman's claim centers on his access to allegedly useful information, which implicates his Sixth Amendment right to cross-examine a witness, as well as his due process right to discover exculpatory evidence.

■ The statutory privilege set forth in Section 5944 is not outweighed by either a defendant's Sixth Amendment right to cross-examine a witness or his right to due process of law. *See Commonwealth v. Kyle*, 367 Pa.Super. 484, 493–505, 533 A.2d 120, 130–31 (1987), *appeal denied*, 518 Pa. 617, 541 A.2d 744 (1988), *cited with approval in Commonwealth v. Wilson*, 529 Pa. 268, 276, 602 A.2d 1290, 1295 (finding that the sexual assault counselor's privilege in 42 Pa.C.S. § 5945.1 outweighed a defendant's Sixth Amendment right to cross-examination as well as his right to due process), *cert. denied*, 504 U.S. 977, 112 S.Ct. 2952, 119 L.Ed.2d 574 (1992). Given

the fact that there was no evidence that Mrs. Counterman ever received mental health treatment, and in light of the clear mandate of the statutory privilege, the trial court did not err in denying Counterman's request.

Turning to Counterman's competency-based request for a psychiatric examination of his wife, we note that the determination of testimonial competency rests in the sound discretion of the trial court. *Commonwealth v. Goldblum*, 498 Pa. 455, 464, 447 A.2d 234, 239 (1982). Furthermore, "the mental competency of every witness is presumed . . . ." *Commonwealth v. Ware*, 459 Pa. 334, 352, 329 A.2d 258, 267 (1974). Incompetency does not follow from the fact that the witness is insane or mentally ill. *Id.* Accordingly, a trial court does not have an obligation to order an investigation of a witness's competency unless the court has some doubt from having observed the witness. *See Commonwealth v. Jennings*, 446 Pa. 294, 304, 285 A.2d 143, 149 (1971); *see also Commonwealth v. Smith*, 414 Pa.Super. 208, 215, 606 A.2d 939, 943 (1992), *appeal denied*, 533 Pa. 624, 620 A.2d 490 (1993).

A witness's competency to testify is premised upon the ability to: (1) perceive an event with a substantial degree of accuracy, (2) remember it, (3) communicate about it intelligibly, and (4) be mindful of the duty to tell the truth under oath. *Goldblum*, 498 Pa. at 465, 447 A.2d at 239. The core of the competency test is the ability to give a correct account of the matters that the witness has seen or heard. *Ware*, 459 Pa. at 353, 329 A.2d at 268. In the present matter, Counterman's bare assertions concerning Mrs. Counterman's intelligence and her slowness in responding to questions did not suggest that she could not accurately describe the events leading up to the fire. Consequently, the trial court properly exercised its discretion in denying Counterman's request for a competency examination of his wife.

The remaining pretrial claim concerns the trial court's ruling denying Counterman's request to review for use as impeachment the alleged juvenile records of two of the Com-

monwealth's fact witnesses. Counterman contends that the testimony of the two witnesses in question, Iris Rios and Nicole Pugh, was important among the Commonwealth's proofs because it tended to establish that Counterman was on the first floor of the Counterman residence during the fire and that he harbored animosity toward his family. Ms. Rios and Ms. Pugh were neighbors of the Countermans. Ms. Rios testified regarding her efforts to rescue Mrs. Counterman and to Counterman's relationship with his family. Ms. Pugh also provided testimony respecting the relationship Counterman had with his wife and, in addition, Counterman's actions during the fire.

Relying on the decision of the United States Supreme Court in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), this Court has held that:

> [t]he Sixth Amendment right of confrontation requires that a defendant in a state criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witnesses' probationary status as a juvenile delinquent notwithstanding that such impeachment would conflict with the state's asserted interest in preserving the confidentiality of juvenile delinquency proceedings.

*Commonwealth v. Slaughter,* 482 Pa. 538, 550, 394 A.2d 453, 458–59 (1978). In keeping with the dictates of *Davis,* this Court has consistently required the Commonwealth to produce a witness's juvenile record so that there can be a determination as to whether the record supports any basis upon which the defendant could argue that the witness was biased. *See Slaughter,* 482 Pa. at 552, 394 A.2d at 460; *Commonwealth v. Simmon,* 521 Pa. 218, 224, 555 A.2d 860, 863 (1989).

■ Under the principles set forth in *Slaughter,* the trial court erred in denying Counterman's request to review juvenile record information that may have existed concerning Ms. Rios and Ms. Pugh. However, contrary to Counterman's assertions, the witnesses were not central to the Commonwealth's proof. Ms. Rios' testimony dealt primarily with her efforts to rescue Mrs. Counterman from the fire and was corroborated

by other witnesses. Although she testified that she had heard Counterman, on occasion, arguing with his wife over the children and, in one instance, threatening her, she was unable to recall when the arguments occurred. With respect to the testimony of Ms. Pugh, she corroborated Counterman's version of the events.[7] As was the case with Ms. Rios, Ms. Pugh testified that she had heard the Countermans arguing in the past, but she was unable to recall when the arguments took place or what was said. Though Ms. Pugh did place Counterman on the first floor of his home at the time of the fire, Counterman admitted this fact and such testimony was cumulative to that provided by Mrs. Counterman. In many respects, Ms. Pugh's testimony, on the whole, militated in favor of Counterman.

In light of the substantial evidence of guilt, the fact that the testimony in issue was corroborated by other witnesses, and the *de minimis* nature of any prejudice that may have attended the trial court's ruling, the proposed bias-based impeachment of Ms. Rios and Ms. Pugh would not have impacted upon the verdict. *See generally Commonwealth v. Foy*, 531 Pa. 322, 327, 612 A.2d 1349, 1352 (1992)(delineating the circumstances for applying the harmless error rule). Accordingly, the trial court's error in denying Counterman access to the possible juvenile records of Ms. Rios and Ms. Pugh was harmless. *See, e.g., Commonwealth v. Nolen*, 535 Pa. 77, 85, 634 A.2d 192, 196 (1993)(holding that an error in refusing to permit the cross-examination of a co-defendant regarding pending charges was harmless, as the testimony was not central to the Commonwealth's proof and was corroborated by other witnesses).

## Alleged Trial Errors

With respect to Counterman's numerous claims of trial error, we begin with his argument that he was entitled to a

---

7. Ms. Pugh's testimony was consistent with Counterman's testimony as to the events on the morning of the fire in that she recalled hearing noises from pots and pans coming from the Counterman home and she noticed Counterman walking around in the downstairs area. She also recalled that Counterman shouted for his wife to get the children because there was a fire.

mistrial because the Commonwealth failed, in advance of trial, to provide the defense with certain discoverable statements. The complained of omissions are as follows:

1. A whited out portion of a July 25, 1988 police report in which Sergeant Kochan noted: "I also interviewed the wife, Janet Counterman. She stated the older son Christopher woke her up and told her there was a fire downstairs. She woke her husband up. That was all she remembered."

2. An August 22, 1988 statement in which Janet Counterman told Officer MacLean, in pertinent part, that: "James and Christopher came into the room and said there was a fire. She was asleep, said mom, there is a fire downstairs. James said Christopher started the fire. He had matches. Chris said he did it after she asked him. She woke Dennis up and he went downstairs to try to put the fire out. James and Chris went to their bedroom on their own, she went to pick up the baby, Scott, but it got too smoky so she climbed out the window."

3. An August 23, 1988 statement of Officer MacLean asking Mrs. Counterman about the August 22, 1988 statement she gave him.

4. A July 25, 1988, statement Counterman made to Joan Hoffman, a medical social worker, wherein Counterman expressed concerns about his marriage and insurance coverage.

Counterman contends that the Commonwealth's late disclosure of the above statements violated both his right to due process of law and Pennsylvania Rule of Criminal Procedure 305(B).

As to Counterman's constitutionally based claim, the prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, regardless of the motive of the prosecution. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Commonwealth v. Powell,* 449 Pa. 126, 130, 295 A.2d 295, 297 (1972). Materiality is satisfied when there is a "reasonable probability" of a

different result if the evidence had been disclosed. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). For purposes of evaluating a claim under *Brady*, there is no distinction between evidence that exculpates and evidence that impeaches. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). However, the constitutional duty to disclose under *Brady* encompasses only exculpatory evidence, *see Commonwealth v. Morales*, 549 Pa. 400, 413, 701 A.2d 516, 523 (1997); it is not a general rule of discovery in criminal cases. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977); *Commonwealth v. Murphy*, 493 Pa. 35, 45, 425 A.2d 352, 357 (1981).

In this case, the July 25 and August 22 statements made by Mrs. Counterman to Sergeant Kochan and Officer MacLean were exculpatory and thus material. The statements made by Counterman to Ms. Hoffman, however, were inculpatory and, as a result, are not governed by the *Brady* rule. *See Morales*, 549 Pa. at 413, 701 A.2d at 523. Nevertheless, Counterman was provided with his wife's statements to Sergeant Kochan, Officer MacLean, and Ms. Hoffman during the course of the trial. Indeed, the trial court recessed to permit Counterman's attorneys to review the statements and interview Officer MacLean. Counterman's attorneys were also able to interview Ms. Hoffman before she testified. Following the receipt of the statements, defense counsel cross-examined the respective police witnesses and impeached Mrs. Counterman on exculpatory and inconsistent portions. The jury, therefore, was able to evaluate the exculpatory evidence before reaching its verdict. Under such circumstances, the mandates of *Brady* have been satisfied. *See Commonwealth v. Chambers*, 528 Pa. 558, 573, 599 A.2d 630, 637 (1991), *cert. denied*, 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1992); *Murphy*, 493 Pa. at 45, 425 A.2d at 357.

Counterman also asserts that the belated disclosure of the statements in issue violated Pennsylvania Rule of Criminal Procedure 305(B), which, in relevant part, provides:

**(B) Disclosure by the Commonwealth.**

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

(a) Any evidence favorable to the accused which is material either to guilt or to punishment, and which is within the possession or control of the attorney for the Commonwealth; [and]

(b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made, which is in the possession or control of the attorney for the Commonwealth....

**(E) Remedy.** If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 305(B), (E). The Commonwealth's failure to disclose upon request the exculpatory statements of Mrs. Counterman and the inculpatory statements of Counterman violated Rule 305(B). However, the trial court is accorded broad discretion in deciding the appropriate remedy for a discovery violation. *Commonwealth v. Jones,* 542 Pa. 464, 507, 668 A.2d 491, 512 (1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). A mistrial is required only when a discovery violation is of such a nature as to deprive the defendant of a fair trial. *See Chambers,* 528 Pa. at 575, 599 A.2d at 637. Accordingly, a defendant seeking relief from a

discovery violation must demonstrate prejudice. *Jones,* 542 Pa. at 507, 668 A.2d at 512.

Counterman argues that the late disclosure prejudiced him in that he was prevented from cross-examining the pathologist, the coroner, and the Commonwealth's arson experts as to the statements in issue. He also alleges that he was unable to reference the statements during the voir dire of the jury. In making these generalized allegations of prejudice, Counterman does not explain how the statements would have altered his cross-examination or voir dire. He was able to present the exculpatory evidence through the cross-examination of his wife and the respective police witnesses who took the statements. In light of the fact that his ability to present the evidence in issue was not impaired by the late disclosure, Counterman has not demonstrated prejudice.[8]

 Counterman's next argument pertains to the trial court's refusal to sequester Mrs. Counterman during the testimony of Sergeant Kochan and the medical personnel who treated her. As this Court recently stated in *Commonwealth v. Henry,* 550 Pa. 346, 706 A.2d 313 (1997), a request for sequestration must be specific and supported by a showing that the interests of justice require it. *Id.* at 361, 706 A.2d at 320. The purpose of sequestration is to prevent a witness from molding his testimony with that presented by other witnesses. *Id.* Because of the practical considerations that attend trials, the decision to sequester witnesses is left to the discretion of the trial judge and will be reversed only for an

---

**8.** We take this opportunity, however, to point out that "[t]he purpose of Rule 305 is to prevent trial by ambush ....." *Commonwealth v. Ulen,* 539 Pa. 51, 59, 650 A.2d 416, 419 (1994). Moreover, the gamesmanship of the assistant district attorney in this case implicates not only the Commonwealth's duty under Rule 305, but also a prosecutor's professional responsibility. *See* Rule of Professional Conduct 3.8(d)("The prosecutor in a criminal case shall: make *timely* disclosure to the defense of information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense ....."); ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3-3.11(a)(3d ed. 1993)("A prosecutor should not intentionally fail to make timely disclosure to the defense, *at the earliest feasible opportunity,* of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged ....").

abuse of discretion. *See Commonwealth v. Kravitz,* 400 Pa. 198, 217–18, 161 A.2d 861, 870 (1960), *cert. denied,* 365 U.S. 846, 81 S.Ct. 807, 5 L.Ed.2d 811 (1961).

■ The testimony that Mrs. Counterman was permitted to hear primarily related to her injuries, as well as her statements to the medical witnesses and Sergeant Kochan. This testimony did not inculpate Counterman. Moreover, Counterman fails to indicate how Mrs. Counterman's testimony was tailored as a result of her presence in the courtroom; thus, Counterman has not shown that the denial of the sequestration request resulted in prejudice or contravened the interests of justice. *See Henry,* 550 Pa. at 362, 706 A.2d at 320. Absent such a showing, we cannot conclude that the trial court abused its discretion.

■ Counterman also challenges the trial court's decision to permit Mrs. Counterman to testify to the statement of her deceased children, Christopher and James, that "daddy is downstairs starting a fire," which the trial court permitted under the excited utterance exception to the hearsay rule.

■ To qualify as an excited utterance, a statement must be:

> [a] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

*Allen v. Mack,* 345 Pa. 407, 410, 28 A.2d 783, 784 (1942). Admissibility pursuant to this exception requires, initially, that the declarant observe an event sufficiently startling and so near in time as to render his reflective thought process inoperable and, secondly, that the declaration constitute a spontaneous reaction to the startling event. *Commonwealth v. Cooley,* 465 Pa. 35, 41, 348 A.2d 103, 106 (1975).

Counterman's efforts to set his occupied home ablaze certainly qualify as a startling event. *See, e.g., Beliron Const. Co. v. Cohen–Seltzer, Inc.*, 232 Pa.Super. 236, 241, 335 A.2d 767, 770 (1975)(noting that a fire is a startling event). Furthermore, the circumstances surrounding the event established that the children were in a position to, and indeed did, observe Counterman's actions. *Compare Commonwealth v. Sanford*, 397 Pa.Super. 581, 589–90, 580 A.2d 784, 788 (1990)(finding the excited utterance exception applicable where the testimony of the child's mother and physician circumstantially established the event evincing that the child perceived "some unexpected or shocking occurrence"), *appeal denied*, 527 Pa. 586, 588 A.2d 508 (1991) *with Commonwealth v. Pronkoskie*, 477 Pa. 132, 139–40 nn. 6–8, 383 A.2d 858, 861–62 nn. 6–8 (1978) (declining to apply the excited utterance exception where a minor declarant's location within the trailer home coupled with her testimony indicated that she did not observe the event). Additionally, the children's utterance was made in direct response to the event. Here, the children, alarmed at the actions of their father, burst into their mother's bedroom and uttered the statement in question, which therefore qualifies the statement as an excited utterance. *See generally Cooley*, 465 Pa. at 41, 348 A.2d at 107 (noting that the spontaneity of a particular statement is dependent upon the peculiar facts of each case).

Alternatively, Counterman maintains that his children, by virtue of their age, were incompetent to testify; therefore, he argues that any declarations made by them would be inadmissible. In *Pronkoskie*, this Court noted, albeit in dicta, that the admissibility of a properly qualified excited utterance stems from its reliability arising out of the spontaneity of the response, which is not diminished because of an allegation that the declarant would not be competent to testify at trial. *See Pronkoskie*, 477 Pa. at 138 n. 5, 383 A.2d at 861 n. 5; *see also* McCormick, Evidence §272, at 222 (4th ed.1992); Annotation, *Admissibility Of Testimony Regarding Spontaneous Declarations Made By One Incompetent To Testify At Trial*, 15 A.L.R.4th 1043 (1998)(collecting cases). We find this reason-

ing persuasive given the context of the statement at issue. Accordingly, the trial court properly admitted the statement of Counterman's children.

Counterman's next allegation of trial error concerns testimony volunteered by the County Coroner as to the manner of death. The coroner testified that the children's manner of death was a homicide. Counterman argues that such testimony was impermissible because it addressed the ultimate issue on which the coroner was not qualified to render an opinion.

In *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978), this Court recognized that "the contention that an expert should never be permitted to express an opinion on the ultimate issue is ... misconceived." *Id.* at 352, 390 A.2d at 178. In *Daniels*, a forensic pathologist testified that the manner of death was a homicide. *See id.* at 352, 390 A.2d at 179. The *Daniels* Court determined that a mistrial was not warranted, because the doctor's use of a shorthand term was fully elucidated by his testimony and the trial court's instruction. *See id.* at 353, 390 A.2d at 179.

The ultimate issue in this case was whether Counterman was responsible for the deaths of his children, which was in no way decided by the coroner's use of the term "homicide." *See id.* Furthermore, the trial court issued a cautionary instruction, which properly oriented the jury as to their responsibility to decide the ultimate issue in the case. Under the circumstances, we can presume that the jury followed the trial court's cautionary instruction, *see Commonwealth v. Baker,* 531 Pa. 541, 559, 614 A.2d 663, 672 (1992), and thus, any prejudice that might otherwise have been visited upon Counterman by virtue of the coroner's testimony was cured.

Counterman also alleges that the trial court erred in allowing the Commonwealth to introduce evidence of his purported marijuana use on the day prior to the fire. Counterman maintains that this evidence was irrelevant and constituted improper character evidence.

Evidence of a defendant's prior crimes is not generally admissible against the defendant solely to show his bad character or his propensity for committing criminal acts, as proof of the commission of one offense is not generally proof of the commission of another. *Commonwealth v. Lark,* 518 Pa. 290, 302, 543 A.2d 491, 497 (1988).[9] This general rule of preclusion, however, is subject to numerous exceptions where special circumstances exist that render such evidence relevant for some legitimate evidentiary reason and not merely to prejudice the defendant by showing him to be a person of bad character. *Commonwealth v. Billa,* 521 Pa. 168, 177, 555 A.2d 835, 840 (1989). The special circumstances for admitting other crimes evidence include, but are not limited to, proof of: motive, intent, absence of mistake or accident, a common scheme, plan or design, and identity. *Id.*

Here, the admission of Counterman's alleged marijuana use was relevant and tended to prove motive in that it contributed to the Countermans' arguments with his wife and, indeed, was integrally bound with the altercation that culminated in Counterman setting the fire. Thus, this evidence tended to make it more probable that Counterman was responsible for the fire. The fact that some degree of prejudice may have attended the admission of the evidence does not render it inadmissible. *See Commonwealth v. Brown,* 489 Pa. 285, 296, 414 A.2d 70, 75 (1980). Here, the nature of the other crimes evidence was not of a character that would inflame the jury. *See Commonwealth v. Morris,* 513 Pa. 169, 177, 519 A.2d 374, 378 (1986). Accordingly, the admission of such evidence was proper.

Counterman also claims that the trial court erred in permitting Joan Hoffman, a medical social worker, to testify that when she met Counterman at the hospital he did not appear to be grieving over the deaths of his children, that he

9. As this Court has held on numerous occasions, the admissibility of evidence is a matter addressed to the sound discretion of the trial court, and an appellate court may only reverse rulings on admissibility upon a showing of an abuse of discretion. *Commonwealth v. Claypool,* 508 Pa. 198, 202, 495 A.2d 176, 178 (1985).

expressed concerns about insurance, and that when she met Mrs. Counterman, she appeared frightened of her husband. He argues that such evidence was not relevant and that any probative value associated with it was outweighed by its prejudicial effect.

Evidence is relevant if it renders the desired inference more probable than it would be without the evidence. *Commonwealth v. Eubanks*, 511 Pa. 201, 208, 512 A.2d 619, 623 (1986). A lay person may testify to distinct facts observed by him concerning the apparent physical condition or appearance of another. *Commonwealth v. Allison*, 550 Pa. 4, 8, 703 A.2d 16, 18 (1997). Indeed, lay testimony as to whether a patient was alert at all times, oriented, in pain, and concerned about her condition has been deemed permissible. *See Commonwealth v. Stickle*, 484 Pa. 89, 106, 398 A.2d 957, 966 (1979). Here, Ms. Hoffman's testimony concerned her observations of Counterman's condition and appearance and was therefore admissible. Moreover, Mrs. Counterman's fear of her husband was relevant to the charge that Counterman had intimidated a victim or witness.

Counterman's next allegation of error concerns the admission of out-of-court statements made by his wife to Officer MacLean, Dr. Earnest, her treating physician, and Joan Hoffman. Counterman contends that the statements were inadmissible hearsay and impermissibly bolstered his wife's credibility.

The statement made by Mrs. Counterman to Officer Mac-Lean was a product of the August 23 interview that occurred after she had seen Counterman and changed her story. Officer MacLean testified:

> Janet then admitted on Tuesday that she had lied to me on Monday; that Dennis was in the house, that Dennis was downstairs. She went to the top of the steps and he said, if you come down I am going to light it or burn you, I don't recall the exact words; that they had a fight because Dennis was smoking pot.

Mrs. Counterman, however, testified prior to Officer Mac-Lean, and she was extensively cross-examined as to her prior statements. Her credibility was questioned, and she repeatedly stated that she could not remember certain details from her prior statements. The trial court ruled that the above statement to Officer MacLean was a prior consistent statement and was therefore admissible.

As a general rule, a prior consistent statement is hearsay, and its admissibility is dependent upon an allegation of corrupt motive or recent fabrication. *Commonwealth v. Hutchinson,* 521 Pa. 482, 487, 556 A.2d 370, 372 (1989). Additionally, such statements have been admitted in response to an allegation of faulty memory. *Commonwealth v. Wood,* 417 Pa.Super. 264, 269, 612 A.2d 474, 476 (1992), *appeal denied,* 534 Pa. 639, 626 A.2d 1157 (1993). It is not necessary, however, that the impeachment of a witness explicitly indicate recent fabrication; rather, it is only necessary that the questioning suggest that the testimony is a recent fabrication. *Commonwealth v. Bailey,* 322 Pa.Super. 249, 266, 469 A.2d 604, 613 (1983). In the present case, the extensive cross-examination of Mrs. Counterman as to her inconsistent statements coupled with the attack on her ability to remember specific details was sufficient to warrant the admission of her prior consistent statement to Officer MacLean. The fact that the prior consistent statement was introduced during the Commonwealth's case in chief is of no moment in that the trial court has discretion as to the order of proof. *Commonwealth v. Jones,* 539 Pa. 222, 231, 651 A.2d 1101, 1106 (1994), *cert. denied,* 516 U.S. 835, 116 S.Ct. 113, 133 L.Ed.2d 65 (1995). Moreover, because Counterman's defense centered upon impeaching the credibility of his wife, the admission of the prior consistent statement in the Commonwealth's case-in-chief was a proper exercise of discretion by the trial court. *See Commonwealth v. Smith,* 518 Pa. 15, 40, 540 A.2d 246, 258 (1988).

With respect to the statements made by Mrs. Counterman to Dr. Earnest and Ms. Hoffman, Dr. Earnest testified that Mrs. Counterman did not include her husband on her visitor list, that at a later time Mrs. Counterman wanted to

see her husband, but then soon thereafter again changed her mind. Ms. Hoffman also testified to the requests that Mrs. Counterman made regarding her visitor list, and that Mrs. Counterman was glad when she learned that her husband had been arrested. The statements testified to by Dr. Earnest and Ms. Hoffman constituted inadmissible hearsay. Nevertheless, we agree with the trial court that, in light of the substantial evidence of guilt and the insignificant prejudice attached to the statements, the error in their admission was harmless beyond a reasonable doubt. *See Commonwealth v. Story,* 476 Pa. 391, 412, 383 A.2d 155, 166 (1978).

The next claim of error concerns testimony from Dr. Mihalakis, the Commonwealth's forensic pathologist. In the course of explaining his diagnosis, Dr. Mihalakis, very briefly, noted that the bodies of Christopher and James Counterman evidenced post-mortem charring.

Counterman alleges that such testimony was inflammatory and that its prejudicial effect outweighed any probative value. As previously noted, evidence is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Commonwealth v. Scott,* 480 Pa. 50, 54, 389 A.2d 79, 82 (1978). Dr. Mihalakis' testimony was of relevant evidentiary value to the jury in understanding the severity of the fire and the means of death of the children. Although the testimony may have provided the jury with an image of the manner of death, the mere fact that such an image was presented to the jury did not warrant the exclusion of the evidence. *See, e.g., Commonwealth v. Faulkner,* 528 Pa. 57, 78, 595 A.2d 28, 39 (1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992).

Next, Counterman claims that the trial court erred in prohibiting him from presenting expert opinion testimony that he did not fit the profile of an arsonist. The offer of proof relative to the proposed testimony was:

[Mr. Long]: OK, now I know we are going to get into a problem here. As part of his profession, OK, he knows the

profile of an arsonist, and this is from investigating all of these arsons. And if you look in the fire arson books and stuff, they have profiles in there and one of them, OK, what he would testify to as far as Dennis not fitting the profile of an arsonist, would be the following: first of all, arsons of this type, OK, the Commonwealth is claiming from what I can get – well, first of all they are claiming first degree, so they have to be claiming that he intentionally set the fire in order to kill the children, and not because he was a firebug and wanted to see the house burn, OK.

Second of all, the Commonwealth has brought in evidence of insurance, OK, so there you have an intention to collect insurance money. If an arsonist would have either one or both of those motives, if you want to indicate that, OK, the fire would have been set at night, during – not during the day because the arsonist doesn't want the fact of the fire being discovered too soon because he wants the thing to burn.

OK, if he is setting it in order to see the fire engines come and watch it burn, then he will set it at anytime and he will call the fire department in if he has to because that's what he likes to do, but if he is setting it to either kill somebody or to destroy the building in order to get the insurance, he doesn't want the fire department coming there within five minutes and putting out the fire, OK.

And as far as – another thing, he would not have run outside.

"Expert testimony is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill or occupation beyond the knowledge or experience of the average layman." *Commonwealth v. O'Searo,* 466 Pa. 224, 229, 352 A.2d 30, 33 (1976). Where, however, the issue involves a matter of common knowledge, expert testimony is inadmissible. *Id.* For example, the truthfulness of a particular witness is a question that must be answered based upon the ordinary experiences of life, common knowledge of the natural tendencies of human behavior, and observations of the character and demeanor of the witness. *See Common-*

*wealth v. Davis,* 518 Pa. 77, 83, 541 A.2d 315, 317 (1988). As dishonesty is within the ordinary capacity of jurors to assess, such determination is exclusively within the province of the jury. *See id.*

█ Here, the proffered expert testimony was an attempt to show that Counterman's conduct after the fire was consistent with the actions of an innocent individual. Thus, the sole purpose for introducing the proposed profile testimony was to bolster the credibility of Counterman through the cloak of expert authority. In the past, this Court has precluded the Commonwealth from introducing expert testimony of a victim's post-attack behavior to show that such was consistent with the behavior of known victims of a particular class. *See Commonwealth v. Gallagher,* 519 Pa. 291, 297, 547 A.2d 355, 358 (1988)(finding that evidence outlining the behavior profiles of rape victims was inadmissible to explain the failure of the victim to initially identify her attacker); *see also Commonwealth v. Emge,* 381 Pa.Super. 139, 144, 553 A.2d 74, 76 (1988)(holding that expert testimony that a child's post-attack behavior was consistent with the behavior of victims of child sexual abuse invaded the province of the jury and was inadmissible). Similarly, in *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621 (1995), *cert. denied,* 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996), this Court held that the trial court properly precluded the defendant from introducing expert testimony respecting the psychological characteristics and behavior patterns of eyewitnesses, as such evidence invaded the credibility assessing function of the jury. *Id.* at 230–31, 662 A.2d at 630–31. The evidence at issue in this case is substantially similar in evidentiary effect to that condemned in *Gallagher* and *Simmons* and, for similar reasons, was inadmissible.[10] Therefore, the trial court properly exercised its dis-

10. Our ruling on this issue is in accord with a number of other jurisdictions that have evaluated this type of opinion evidence. *See, e.g., Hoosier v. State,* 612 So.2d 1352 (Ala.Crim.App.1992) (disallowing opinion evidence offered by defendant that he did not fit the profile of a battering parent); *Wyatt v. Florida,* 578 So.2d 811 (Fla.Dist.Ct.App.) (precluding defendant from introducing expert testimony that he did not fit the profile of a pedophile), *review denied,* 587 So.2d 1331 (Fla.1991); *People v. Berrios,* 150 Misc.2d 229, 568 N.Y.S.2d 512 (1991) (collecting cases).

cretion in excluding the profile evidence offered on behalf of Counterman.[11]

■ Counterman next claims error in the trial court's failure to instruct the jury on voluntary manslaughter based upon heat of passion. *See* 18 Pa.C.S. §2503(a)(defining the offense as a killing under a sudden and intense passion resulting from serious provocation). At the time of Counterman's trial, the law relating to this form of voluntary manslaughter was that a defendant charged with a criminal homicide was entitled to such a charge even in the absence of supporting evidence. *See Commonwealth v. Jones,* 457 Pa. 563, 573–74, 319 A.2d 142, 148, *cert. denied,* 419 U.S. 1000, 95 S.Ct. 316 (1974); *Commonwealth v. Griffin,* 357 Pa.Super. 308, 317, 515 A.2d 1382, 1387 (1986), *appeal denied,* 515 Pa. 574, 527 A.2d 535 (1987). Since Counterman's trial, however, this Court has ruled that a voluntary manslaughter instruction based upon heat of passion is only required when there is evidentiary support. *Commonwealth v. Browdie,* 543 Pa. 337, 349, 671 A.2d 668, 672 (1996).[12] Here, there was no evidence of either a sudden and intense passion or serious provocation by the victims of the offense, namely, Counterman's children. *See Commonwealth v. Jones,* 546 Pa. 161, 195, 683 A.2d 1181, 1197 (1996)(holding that the provocation necessary for such an instruction must come from the individual who was killed).

■ Nevertheless, even under the state of the law that existed at the time of Counterman's conviction, the failure to instruct the jury on "heat of passion" voluntary manslaughter

**11.** Because of our disposition of this issue, we do not reach the question of whether such evidence is sufficiently reliable for admissibility. *See generally Commonwealth v. Dunkle,* 529 Pa. 168, 176–77, 602 A.2d 830, 834 (1992) (holding that expert testimony of behaviors exhibited by abused children failed to meet the *Frye* test for admissibility).

**12.** Notably, this Court has applied the rule enunciated in *Browdie* retroactively, *see, e.g., Commonwealth v. Speight,* 544 Pa. 451, 466–67, 677 A.2d 317, 324–25 (1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997), and Counterman makes no argument against such application.

would have required a new trial only if Counterman had suffered prejudice. *See Jones,* 457 Pa. at 574, 319 A.2d at 148; *Commonwealth v. Mignogna,* 401 Pa.Super. 188, 204, 585 A.2d 1, 8 (1990), *appeal denied,* 530 Pa. 660, 609 A.2d 167 (1992). Here, the jury was instructed as to murder in the third degree, which is an unlawful killing with malice. *See Commonwealth v. Carter,* 481 Pa. 495, 498, 393 A.2d 13, 15 (1978). The jury was thus provided with an alternative to find a lesser degree of culpability. Because the jury chose to ignore this alternative, there is no basis for a finding of prejudice. *Jones,* 457 Pa. at 574, 319 A.2d at 148. As the *Jones* Court explained, "[t]here is not the slightest reason to believe that the jury would have returned a verdict of voluntary manslaughter out of sympathy or in recognition of the factors that they may have deemed mitigating where those factors were not sufficiently compelling to cause them to elect a lesser alternative that was offered." *Jones,* 457 Pa. at 574, 319 A.2d at 148.

Counterman's final allegation of error in the guilt phase of trial is that the verdict was against the weight of the evidence. In support of this argument, Counterman avers that the testimony of his wife was inconsistent and conflicting. He also posits that he did not have a motive to commit the crimes and that there was a lack of positive scientific evidence.

 As this Court has explained previously, a new trial will not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion. *Commonwealth v. Brown,* 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). Rather, a new trial will only be ordered when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. *Id.* In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. *Id.* Thus, the trial court's denial of a motion for a new trial because the verdict is not opposed to the weight of the evidence is the least assailable of its rulings. *Id.* at 437, 648 A.2d at 1190.

■ While the testimony of Mrs. Counterman was, in comparison to some of her pretrial statements, inconsistent, the inconsistencies between her pre-trial statements and her trial testimony bore on her credibility. Credibility, of course, is within the sole province of the fact finder, in this case, the jury. Moreover, the jury in this case could have properly deduced that some of the inconsistency between Mrs. Counterman's pretrial statements and her trial testimony resulted from Counterman's intimidation, for which he was convicted. Furthermore, the scientific evidence established that the fire was intentionally set and that a flammable liquid was used as an accelerant. Counterman's own arson expert testified contrary to Counterman in terms of the origin of the fire, admitted that the fire was intentionally set, and acknowledged that the burn patterns on the floor of the building were consistent with a pour pattern. Under the circumstances, we cannot discern an abuse of discretion on the part of the trial court.

## PENALTY PHASE

Counterman's first assertion of error relative to the penalty phase concerns the question posed by the district attorney to Dr. Cook, the forensic psychologist who testified on behalf of the defense. During cross-examination, Dr. Cook was asked if he had explored whether or not Counterman had started other fires. Dr. Cook responded, "Yes, I did explore that area." No further testimony was elicited or presented on this issue. Thereafter, the trial court judge gave the following curative instruction:

Now, ladies and gentlemen, that last question, we are striking from the record and you should disregard any implication whatsoever from that question, alright? ... Now you understand that the court has instructed, you disregard that question and any possible implication. Very good.

■ As the question was not relevant to any of the alleged aggravating or mitigating circumstances, the trial court properly instructed the jury to disregard it. There is no evidence

that the jury relied upon such testimony or any other extraneous factor in returning sentences of death; indeed, the jury actually found that the defendant had no significant history of prior criminal convictions. Accordingly, there is no basis to conclude that the testimony at issue was prejudicial to Counterman.

█ Finally, Counterman asserts that the aggravating circumstance of committing a killing while in perpetration of a felony, 42 Pa.C.S. §9711(d)(6), should not be submitted to the jury when the underlying felony was the instrumentality in the deaths. In *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987), however, this Court held that the crime of arson endangering persons can constitute an aggravating circumstance under Section 9711(d)(6) even though arson was the instrumentality by which the killing was accomplished. *Id.* at 485, 533 A.2d at 86. Consequently, the jury in this case was properly permitted to consider the (d)(6) aggravator.

## INDEPENDENT REVIEW OF THE DEATH SENTENCE

Having concluded that Counterman's claims are without merit, we must affirm the judgment of sentence unless we determine that:

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).[13]

After reviewing the record, we conclude that the sentences of death imposed in this case were not the product of passion,

13. By legislation enacted June 25, 1997, subsection (h)(3)(iii) providing for proportionality review and a portion of subsection (h)(4) that references such review were stricken from Section 9711(h). *See* Act of June 25, 1997, No. 28, § 1 (Act 28), effective immediately. However,

prejudice or any other factor, but rather, were based upon the evidence that Counterman killed the victims with specific intent during an arson.

In addition, we conclude that the three aggravating circumstances found by the jury were supported by the evidence. The Commonwealth presented evidence that Counterman killed his children while committing arson, thus establishing that the homicide was committed during the perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). The Commonwealth also presented evidence that Counterman created a grave risk of death to other persons, specifically, his wife, his neighbors, and the firefighters, in addition to the victims of the offense. *See* 42 Pa.C.S. § 9711(d)(7). Finally, the evidence that Counterman committed other murders before or at the time of the offense, the killing of his two other children, is sufficient to support the multiple murder aggravating circumstance set forth in Section 9711(d)(11). *See Commonwealth v. Zook,* 532 Pa. 79, 119–20, 615 A.2d 1, 21–22 (1992), *cert. denied,* 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993).

Having reviewed Counterman's sentences in light of the sentencing data compiled and monitored by the Administrative Office of the Pennsylvania Courts, we conclude that the sentences of death imposed upon Counterman were not excessive or disproportionate to the penalties imposed in similar cases. *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–708, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdict and sentences of death imposed upon Dennis Counterman by the Court of Common Pleas of Lehigh County.[14]

NIGRO, J., concurs in the result.

this Court will continue to undertake proportionality review in cases where the sentence of death was imposed prior to the effective date of Act 28. *Commonwealth v. Gribble,* 550 Pa. 62, 91, 703 A.2d 426, 440 (1997).

14. Pursuant to 42 Pa.C.S. § 9711(i), the Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania within ninety (90) days.