**[J-85-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 760 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on June 16, 2017 |
| | : | in the Court of Common Pleas, |
| v. | : | Lancaster County, Criminal Division at |
| | : | CP-36-CR-0004095-2015. |
| | : | |
| LEETON JAHWANZA THOMAS, | : | ARGUED: December 4, 2018 |
| | : | |
| Appellant | : | |


**OPINION**


**JUSTICE DOUGHERTY**            **DECIDED: August 20, 2019**

Following a jury trial, appellant Leeton Jahwanza Thomas (a.k.a. "Pie" Thomas) was found guilty of two counts of first-degree murder for the stabbing deaths of Lisa Scheetz and her minor daughter, H.S., one count of attempted murder for stabbing P.S., another minor daughter of Ms. Scheetz, and one count of burglary.[1, 2] After finding a number of aggravating and mitigating circumstances and determining the aggravating circumstances outweighed the mitigating circumstances, the jury returned two verdicts of death. The trial court formally imposed two death sentences, plus a sentence of 20 to 40 years' imprisonment for attempted murder and 3 to 6 years' imprisonment for burglary.

---

[1] *See* 18 Pa.C.S. §2502(a) (criminal homicide); 18 Pa.C.S. §901(a) (criminal attempt); 18 Pa.C.S. §3502(a)(1) (burglary).

[2] S.S., a third minor daughter of Ms. Scheetz, and the sister of H.S. and P.S., was not present when the crimes occurred.

This direct appeal followed[3] and for the reasons expressed herein, we affirm the judgment of sentence.

## I. Sufficiency of the Evidence

As appellant has been sentenced to death, we must independently review the record to determine whether the Commonwealth presented sufficient evidence to sustain the convictions of first-degree murder. *Commonwealth v. Hicks*, 156 A.3d 1114, 1123 (Pa. 2017) ("in all capital direct appeals, this Court conducts an independent review of the sufficiency of the evidence supporting a first-degree murder conviction, even if the defendant does not raise the claim"), *citing Commonwealth v. Zettlemoyer*, 454 A.2d 937, 942 n.3 (Pa. 1982). In conducting our review, we view the evidence in the light most favorable to the Commonwealth as the verdict winner in order to determine whether the jury could have found every element of the crime beyond a reasonable doubt. *Id.*

To convict a defendant of first-degree murder, the Commonwealth must prove beyond a reasonable doubt that the defendant unlawfully killed another human being, the defendant acted with the specific intent to kill, and the killing was willful, deliberate, and premeditated. *Commonwealth v. Dowling*, 883 A.2d 570, 573 (Pa. 2005), *citing Commonwealth v. Spotz*, 716 A.2d 580, 583 (Pa. 1998); 18 Pa.C.S. §2502(a). The specific intent to kill may be inferred from the defendant's use of a weapon on a vital part of the victim's body. *Hicks*, 156 A.3d at 1124. Furthermore, the Commonwealth may sustain its burden by wholly circumstantial evidence and the jury is free to believe all, part, or none of the evidence. *Id.* at 1123, *citing Commonwealth v. Cousar*, 928 A.2d 1025, 1032-33 (Pa. 2007).

---

[3] *See* 42 Pa.C.S. §9546(d) (final order imposing death penalty directly appealable to Supreme Court); 42 Pa.C.S. §9711(h)(1) (sentence of death subject to automatic review by Supreme Court).

Viewing the evidence in the light most favorable to the Commonwealth, the record establishes appellant was acquainted with the victims for many years as their neighbor in a rural area of Lancaster County.[4] On April 15, 2015, following an investigation prompted by Ms. Scheetz's allegations that appellant had sexually assaulted H.S. and S.S., officers of the Pennsylvania State Police (PSP) arrested appellant and charged him with a number of sexual offenses. Appellant, who was born in Jamaica, but is a permanent United States resident holding a green card, was released on bail, and his formal arraignment in the Lancaster County Court of Common Pleas was scheduled for June 26, 2015.[5]

In the early morning hours of June 11, 2015, Mr. and Mrs. Hershey heard terrified screaming emanating from the basement apartment. They opened the door connecting their home to the basement apartment, and found P.S. on the stairs covered with blood. Mr. and Mrs. Hershey pulled P.S. up the stairs into their home, locked their doors, and called 911. P.S., who suffers from cerebral palsy and has a below-average I.Q., told Mr. and Mrs. Hershey, who also knew appellant, that "Pie" had attacked her. When police and EMT personnel arrived, P.S. repeated several times that "Pie did this[.]"[6] N.T. Trial, 6/7/17 at 162. P.S. had been stabbed 10 times.

Police and EMT personnel entered the basement apartment to discover Ms. Scheetz and H.S. dead from numerous stab wounds and it appeared the intruder gained

---

[4] Appellant's residence was located on Conowingo Road in Quarryville, approximately one-half mile from the victims' home. The victims lived in the basement apartment of a two-story home on Spring Valley Road, owned by Steven and Jennifer Hershey, who lived upstairs from the Scheetz family. Appellant had recently remodeled the basement apartment; appellant's wife had been Ms. Scheetz's friend since childhood and a baby-sitter for all three Scheetz girls.

[5] As part of his release on bail, the court entered an order prohibiting appellant from having any contact with H.S., S.S., or other members of the Scheetz family.

[6] Additionally, the 911 call was played for the jury at trial, and P.S. can be heard naming "Pie" as the suspected attacker.

entry to the apartment by cutting a window screen. Autopsies revealed Ms. Scheetz suffered 12 stab wounds to her chest and abdomen that penetrated her heart, lungs and spleen, and H.S. suffered six stab wounds to her face, neck, and shoulder. One of the stab wounds to the neck of H.S. was "through-and-through," meaning the knife entered the right side of the neck and exited the left side of the neck. N.T. Trial, 6/12/17 at 702.

Police immediately proceeded to appellant's residence and drove past it, noticing an upstairs light was on. After turning the cruiser around and positioning themselves, police put spotlights on the house and, using a loudspeaker, told appellant to come outside. Additional lights within the house came on, and appellant's wife appeared at the front door where police told her they needed to talk to appellant. Appellant thereafter arrived at the door in bare feet, wearing only a bathrobe with no underclothing. While securing the residence, which also housed appellant's children and mother, the police noticed a bathroom on the second floor had a wet floor, wet tub, wet wash cloth and a towel on the floor, as if someone had very recently showered. The light in the second-floor bathroom corresponded to the location of the light within the house seen by the police during their initial drive by. The police arrested appellant and later that morning secured a search warrant for the premises.

During the search, Trooper John Connelly entered a laundry room that held a washer and dryer. Trooper Connelly opened the washer, noted a strong odor of bleach, and saw the washer half-full of reddish-brown water that contained submerged items of clothing. Next to the washer was an empty bottle of Clorox bleach. The items of clothing recovered from the washer included a pair of appellant's sneakers. The items were sent to a crime laboratory for forensic testing, where a human blood stain was discovered on a protected area of stitching on the left sneaker. Subsequent testing of that blood sample revealed a DNA match to H.S.

PSP investigators contacted Red Rose K-9, a bloodhound search and rescue organization, to attempt to track a path of the person who may have entered the basement apartment through the screen. Red Rose K-9 personnel arrived at the scene approximately 8 hours after the crimes were committed, retrieved a scent from the screen and delivered the scent to two bloodhounds. The first bloodhound, K-9 Ruben, tracked the scent from the screen directly to the patio of appellant's residence on Conowingo Road. Thereafter, a second bloodhound, K-9 Heather, also tracked the scent from the screen directly to appellant's patio. Additionally, PSP personnel subsequently found and removed several pairs of latex gloves and a camouflage cloth from the toilet drain in the second-floor bathroom.

Prior to trial, appellant filed a motion requesting a hearing to determine whether P.S. was competent to testify at trial and seeking related discovery, and a supplemental motion requesting P.S. be evaluated by an expert. *See* Motion For Competency Hearing And Related Discovery, 3/6/17; Supplemental Motion for Competency Evaluation, 5/17/17.[7] The court denied the motions, but conducted a colloquy of P.S. outside the presence of the jury and permitted the parties to question her as well. Thereafter, the court determined she was competent to testify.[8] During her subsequent testimony, P.S.,

---

[7] In his pre-trial motion filed on March 6, 2017, appellant alleged only that P.S. has "physical and mental handicaps" and "a learning disability," and further described her as being "a few years behind" in terms of her mental capacity. Motion For Competency Hearing And Related Discovery, 3/6/17 at 2, ¶6. Appellant's supplemental motion alleged P.S. had a full-scale I.Q. of 46. Supplemental Motion for Competency Evaluation, 5/17/17.

[8] As we explain more fully in our analysis of the issues raised on appeal, appellant also requested the court permit him to introduce the expert testimony of Suzanne Mannes, Ph.D., regarding factors that affect the accuracy of eyewitness testimony. The court denied the motion, as well as petitioner's post-trial motion to strike the penalty of death on the basis Pennsylvania's death penalty statute imposes no standards upon which the jury may weigh aggravating versus mitigating circumstances. Moreover, prior to trial, on the basis appellant was allegedly unaware he could be deported if convicted of the

among other things, identified appellant — as "Leeton" and "Pie," and by pointing at him — as the person who repeatedly stabbed her as well as her mother and sister on the night in question. She remembered the specific date because it had been her last day of school and her sister S.S. was not home, but was "at the beach[.]" N.T. Trial, 6/8/17 at 269. She recognized Pie because she had known him practically her entire life.[9] Based on the record, it is clear the evidence was sufficient to sustain the verdicts of guilty as to two counts of murder in the first-degree.

## II. Competency

Appellant's first two issues on appeal are related and his first issue has two components. He first claims the trial court erred and abused its discretion by (a) denying his initial pre-trial motion requesting a competency hearing and related discovery with respect to P.S.'s alleged intellectual and developmental limitations because they may affect her competency to testify, and (b) denying his supplemental motion requesting a competency evaluation to be conducted by an expert obtained by the defense after appellant reviewed P.S.'s educational records which indicated she had a full-scale I.Q. of 46. In his second issue, appellant claims the competency colloquy conducted by the trial court outside the presence of the jury was inadequate to establish P.S.'s competency to testify because "the court did not focus any of its inquiry on P.S.'s ability to perceive an event, recall the event, or communicate about it intelligently, or on her ability to understand the duty to tell the truth under oath." Appellant's Brief at 33.

---

pending sexual assault charges, defense counsel objected to any evidence of potential deportation. The trial court did not rule on this latter motion, but at trial, the court permitted the Commonwealth to present evidence of appellant's potential deportation as a possible motive for the murders.

[9] P.S. was 15 years old on the night of the attack and 17 years old at the time of trial.

## A. Pre-trial requests for hearing and expert examination

The gravamen of appellant's first issue is the assertion a pre-trial competency hearing was "required" for the trial court to determine whether an expert's evaluation of P.S. was necessary to assist the court in determining whether she was competent to testify at trial. *See* Appellant's Brief at 24-28. Appellant alleges such a hearing was necessary and required because P.S. is "significantly mentally disabled, with a full scale I.Q. of only 46." *Id.* at 24. Thus, appellant insists the trial court erred in denying his pre-trial requests for a competency hearing, related discovery, and evaluation by an expert. Appellant cites to three cases that purportedly support his claim. S*ee* Appellant's Brief at 27, *citing Commonwealth v. Koehler*, 737 A.2d 225, 239 (Pa. 1999), *Commonwealth v. Boich*, 982 A.2d 102, 109-110 (Pa. Super. 2009) (*en banc*), and *Commonwealth v. Alston*, 864 A.2d 539, 549-50 (Pa. Super. 2004) (*en banc*). The Commonwealth responds the trial court's decision to conduct a competency colloquy during trial, rather than a pre-trial competency hearing was well within its discretion, and its decision should not be disturbed on appeal absent an abuse of that discretion. In its opinion, the trial court first recognized a witness is presumed to be competent, the determination of competency rests in the sound discretion of the trial court, and then determined P.S. was competent to testify based on its observation and evaluation of her during the competency colloquy conducted outside the presence of the jury at trial. Trial Court Op. at 2-3 (unpaginated original).

Given the gravamen of appellant's argument is the trial court was **required** to conduct a pre-trial competency hearing, the cases he cites are inapposite, as none stand for that proposition. In *Koehler*, the defendant was charged with double murder, and during trial, he requested the court order a Commonwealth witness to undergo a psychiatric evaluation on the basis the witness's perceptions and recollections of the events in question "may have been inaccurate because of her psychiatric instability and/or

drug use." 737 A.2d at 239. The trial court denied the request, and in doing so, stated on the record it had observed and heard the witness's lengthy trial testimony and there was nothing that would allow the court to conclude the witness was not competent "in her ability to observe, her ability to recall, and her ability to relate events[.]" *Id.* On direct appeal, Koehler claimed the trial court erred in denying his request. This Court noted determinations of testimonial competency rest in the trial court's sound discretion, and the court is under "no obligation to order an investigation of the competency of a witness unless the court has some doubt from having observed the witness." *Id.*, *citing Commonwealth v. Counterman*, 719 A.2d 284, 295 (Pa. 1998). The Court noted competency is presumed, the burden of proving incompetency rests on the challenging party, and in order to be competent, a witness must have the ability "to (1) perceive an event with a substantial degree of accuracy, (2) remember it and (3) communicate about it intelligibly (4) mindful of his or her duty to tell the truth under oath." *Id.* (citation omitted). Recognizing the trial court's observations of the witness led it to conclude she was competent to testify, this Court determined "we discern absolutely no abuse of discretion in the refusal of the trial court to order that this witness undergo psychiatric evaluation." *Id.*

In *Boich*, the Commonwealth appealed an order entered by the trial court granting a rape defendant's pre-trial motion to direct the alleged victim-witness to undergo an involuntary psychiatric examination "for purposes of deciding her competency to testify at trial." 982 A.2d at 104. An *en banc* panel of the Superior Court reversed. Pertinent to the instant case, the appellate court noted, "[a]bove all, given the general presumption of competency of all witnesses, a court ought not to order a competency investigation, unless the court has actually observed the witness testify and still has doubts about the witness'[s] competency." *Id.* at 109-110. "[A] court ordered, involuntary psychiatric or

psychological examination 'should never be the starting point' for a competency evaluation." *Id.* at 110, *citing Alston*, 864 A.2d at 549 (additional citation omitted). "Therefore, a court ought not to order an involuntary psychiatric examination of a witness unless the record unequivocally demonstrates a compelling need for the examination." *Id.* (citation omitted). Moreover, in *Alston*, an *en banc* panel of the Superior Court noted, "a plurality of our Supreme Court has concluded that a psychiatric examination of a Commonwealth witness regarding competency may be ordered if a need for the examination is demonstrated." *Alston*, 864 A.2d at 549, *citing Commonwealth v. Garcia*, 387 A.2d 46 (Pa. 1978).

We conclude the trial court did not abuse its discretion when it denied the requested pre-trial competency hearing because appellant did not demonstrate a compelling need for it. Appellant's initial motion alleged P.S. had undefined physical and mental handicaps including a learning disability, and characterized her as "a few years behind." *See* Motion For Competency Hearing And Related Discovery, 3/6/17 at 2, ¶6. Appellant's supplemental motion alleged school records indicated P.S. "possess[ed] a Full Scale I.Q. of 46[.]" Supplemental Motion For Competency Evaluation, 5/17/17 at 1, ¶4. On this basis, the supplemental motion requested the trial court order that P.S. be evaluated by an expert obtained by the defense. However, there is nothing in these assertions showing the necessity for a pre-trial competency hearing or the necessity for evaluation by a psychiatrist or psychologist in lieu of a competency colloquy to be conducted by the court at trial.

The law is clear that testimonial incompetence does not necessarily follow from intellectual disability, *see Commonwealth v. Anderson*, 552 A.2d 1064, 1068-69 (Pa. Super. 1988) ("mentally retarded" witness presumed competent to testify), *appeal denied*

571 A.2d 379 (Pa. 1989),[10] or from insanity or mental illness, *see Dowling*, 883 A.2d at 577-78, *citing Counterman*, 719 A.2d at 295. In *Counterman*, *supra*, the capital murder defendant, who killed his three children in a house fire, raised a pre-trial challenge to his wife's competency to testify, premised in part on her preliminary hearing testimony, in which she exhibited difficulty in comprehending questions and articulating responses. To support his claim, Counterman sought a court order compelling the release of Mrs. Counterman's psychological treatment records and requested the court order her to undergo a psychiatric examination. At a hearing on the motion, Counterman introduced his wife's school records, which reflected she possessed an I.Q. consistent with a diagnosis of intellectual disability. The trial court denied the requests. On direct appeal, in discussing the propriety of the trial court's denial of the requests, this Court noted the mental competency of all witnesses is presumed and incompetency does not follow from the fact of "mental illness." 719 A.2d at 295. The Court then held, in pertinent part, "Counterman's bare assertions concerning Mrs. Counterman's intelligence and her slowness in responding to questions did not suggest she could not accurately describe the events leading up to the fire. Consequently, the trial court properly exercised its discretion in denying Counterman's request for a competency examination of his wife." *Id.* at 296.

A trial court is not required to order a pre-trial competency hearing but may do so in the sound exercise of its discretion. *See id.* at 295. Here, the chief allegations contained in the pre-trial motions for a competency hearing were P.S.'s alleged learning disability supported by a school record reflecting a below average I.Q. The record is clear

---

[10] In years past, the term "mental retardation" was commonly utilized by the professional community and courts. However, in *Hall v. Florida*, 572 U.S. 701, 704 (2014), the High Court recognized the preferred term is "intellectual disability." Accordingly, we use the term "intellectual disability" or "intellectually disabled" unless we are quoting from cases. *See Commonwealth v. Bracey*, 117 A.3d 270, 271 n.2 (Pa. 2015).

the trial court conducted a competency colloquy during trial, outside the presence of the jury, during which it had the opportunity to carefully observe P.S. and consider whether she was, in fact, competent to testify pursuant to the proper legal standard, notwithstanding her physical and intellectual disabilities. Accordingly, we determine the trial court did not err or abuse its discretion in denying appellant's initial and supplemental pre-trial motions seeking a pre-trial competency hearing, discovery and expert evaluation. *See e.g., Garcia*, 387 A.2d at 55 (trial court did not abuse discretion at defendant's murder trial by failing to hold hearing or order psychiatric examination to determine competency of schizophrenic witness residing in mental hospital).

## B. Colloquy

Appellant alleges the competency colloquy the court conducted was deficient because it was too "brief" and because "P.S. provided no verbal response to the majority of the questions." Appellant's Brief at 29. Appellant concedes "[P.S.] was able to state her age (17), her grade in school (11th), that if you say something that's not the truth, it would be 'a lie,' and that if the court stated that the DA was wearing a pink suit, that would be 'a lie.'" *Id.*, *citing* N.T., 6/8/17 at 244-51. Appellant additionally concedes P.S. "[a]fter much prompting," replied in the affirmative when asked if she 1) promised to tell the truth, and 2) would be able to answer questions about what she remembered from the night she was stabbed. *Id.* Appellant claims, without further explanation, "the bailiff and court reporter were assisting her with every question." *Id.* at 30. Appellant also alleges P.S. gave vague answers ("kind of" and "sort of") when asked whether she remembered someone coming to her house and doing bad things, and if she could tell time. *Id.* Appellant also complains the court improperly sustained the Commonwealth's objections

to certain questions posed to P.S. by defense counsel.[11]   Based on these alleged deficiencies in the colloquy, appellant alleges the trial court's determination P.S. was competent to testify was reversible error, entitling him to a new trial, "at which a proper colloquy of P.S. should be conducted to determine whether she is competent to testify." *Id.* at 35.  Finally, appellant alleges the court's error in finding P.S. competent to testify cannot be dismissed as harmless.  Appellant concedes the remaining circumstantial evidence presented against him at trial was significant, but alleges it would have been insufficient to convict him absent the eyewitness identification provided by P.S.  Thus, he claims it cannot be said her testimony did not contribute to the verdict.

The Commonwealth responds "[t]he trial court questioned and received appropriate answers from [P.S.] as to why she was there, her knowledge of the difference between a truth and a lie as well as her duty to tell the truth."  Commonwealth's Brief at 15.  The Commonwealth asserts the record indicates P.S. was able to understand the questions asked and, despite an observed difficulty in expressing herself, to respond intelligently and appropriately.  Moreover, the court properly sustained the Commonwealth's objections "to defense counsel's irrelevant question about a random day of the week, as well as the previously asked and answered question concerning the obligation to tell the truth."  *Id.* at 19.  Thus, the Commonwealth maintains the court did not err or abuse its discretion in determining P.S. was competent to testify.  Even if the court erred, the error was harmless because P.S.'s identification of appellant was cumulative of the 911 call played for the jury, as well as the testimony of Mrs. Hershey,

---

[11] The Commonwealth's objection to the defense query, "[D]o you understand what an oath is[?]," was sustained because the court was satisfied P.S. had already stated she knew the difference between a truth and a lie and had promised to tell the truth.  The Commonwealth's objection to the defense query, "[D]o you remember what you were doing last Monday?[,]" was sustained on the basis of relevance, and because any person might have difficulty recalling specifics of routine past activity.  N.T., 6/8/17 at 252-257.

on-scene paramedics, and PSP troopers who testified at trial they heard P.S. identify appellant as her attacker on the night she was attacked, and there was overwhelming additional circumstantial evidence pointing to appellant's guilt.

The trial court noted a witness is presumed to be competent, and further noted the burden of proving incompetency rests on the party challenging competency. Trial Court Op. at 2 (unpaginated original), *citing Commonwealth v. Goldblum*, 447 A.2d 234, 239 (Pa. 1982). The court set forth the four-pronged legal standard upon which to judge a witness's competency. *Id.*, *citing Koehler*, 737 A.2d at 239. The court observed it questioned P.S., "focusing on her ability to perceive an event, recall the event, communicate about it intelligibly, and her ability to understand the duty to tell the truth[.]" *Id.* at 2-3. The court added there was no difficulty in understanding P.S., and even though she had some difficulty expressing herself, that difficulty was not an issue as to her competence to testify. The court noted competency determinations rest in the sound discretion of the trial court and will not be reversed absent a flagrant abuse of discretion. *Id.* at 2, *citing Commonwealth v. R.P.S.*, 737 A.2d 747 (Pa. Super. 1999) (court did not commit flagrant abuse of discretion in determining six-year-old child witness/victim incompetent to testify where witness had no memory of alleged criminal acts committed against him).

The pertinent Rule of Evidence provides:

**Rule 601.  Competency**

**(a) General Rule.** Every person is competent to be a witness except as otherwise provided by statute or in these rules.

**(b) Disqualification for Specific Defects.** A person is incompetent to testify if the court finds that because of a mental condition or immaturity the person:

(1) is, or was, at any relevant time, incapable of perceiving accurately;

(2) is unable to express himself or herself so as to be understood either directly or through an interpreter;

(3) has an impaired memory; or

(4) does not sufficiently understand the duty to tell the truth.

Pa.R.E. 601.

In *Anderson, supra*, the Superior Court observed although children are presumed competent to testify, "when a proposed witness is under fourteen years of age," the competency investigation "must be more searching in proportion to the proposed witness's chronological immaturity." 552 A.2d at 1068 (citations omitted). The panel went on to hold "the competency considerations applicable to a child witness are also applicable to a retarded adult with the mental capacity of a child[,]" and "the determination of the trial court regarding the testimonial competency of a mentally retarded person will not be disturbed absent a clear abuse of discretion." *Id.* The *Anderson* panel noted, although the intellectually disabled witness in that case "did experience some difficulty in understanding the questions[,] . . . she unambiguously identified [the appellant] as one of the perpetrators of the crime[.]" *Id.* at 1069. Ultimately, the intermediate court was "satisfied . . . the trial court conducted its inquiry into the testimonial competence of [the intellectually disabled witness] in a thorough and conscientious manner, . . . [and] did not abuse its discretion" in determining the witness was competent to testify. *Id.*

We cited *Anderson* with approval in *Dowling*, which involved the trial court's determination an allegedly mentally ill child witness was competent to testify. Although the record showed there were no questions posed of the witness specifically regarding her ability to perceive or recollect past events, we nevertheless observed "a trial court can base its competency determination on criteria other than specifically-targeted questions,

criteria such as the witness's demeanor, alertness, thoughtfulness, sincerity and general responses and testimony." *Dowling*, 883 A.2d at 577, *citing Commonwealth v. Hart*, 460 A.2d 745, 747 (Pa. 1983) (trial court based competency evaluation on witness's demeanor during *voir dire* and testimony); *Commonwealth v. Short*, 420 A.2d 694, 697 (Pa. Super. 1980) (trial court's opportunity to observe demeanor, alertness, thoughtfulness and sincerity of child witness may be more informative than answers child gives to certain questions). Having reviewed the record and all the circumstances, this Court concluded Dowling failed to demonstrate the trial court abused its discretion in finding the challenged witness competent to testify. *Id.*

Here, we have similarly reviewed the entire record, including the transcription of P.S.'s responses during the competency colloquy and her trial testimony.[12] We are satisfied the trial court properly conducted its inquiry and committed no abuse of discretion in determining P.S. was competent to testify. Moreover, the Commonwealth's objections to defense questions regarding P.S.'s understanding of what an "oath" is, and what she did "last Monday" were properly sustained. *See Commonwealth v. Penn*, 439

---

[12] As an example of P.S.'s responses at trial, we note she testified her school year had "ended" the day of the crime, and when asked when that was, she replied "[t]he 10th." N.T., 6/8/17 at 268. She answered "no" when asked if S.S. was home that day, noting S.S. was "at the beach." *Id.* at 269. She also testified her house was in "Quarryville" on "Spring Valley Road[;]" that "the Hersheys" or "Ms. Jen" and "Mr. Steve" lived in the same house[;] and that she and her mother and sisters lived "[d]ownstairs." *Id.* at 269-70. She testified she, her mother, and H.S. "watched TV" that night "because we didn't have to go to school" the next day, and when asked what they were watching, she replied "Supernatural." *Id.* at 271-72. After identifying appellant, and being asked what he did, she testified, "He hurt me." *Id.* at 274. She testified he had "a knife[;]" she first saw him "[i]n our kitchen[;]" and when asked how many times appellant stabbed the victims, she replied, "I don't remember how many times he did[,]" but it was "more than once[;]" and she answered "yes" when subsequently asked "was it a lot of times?" *Id.* at 274-76. She testified she went "upstairs[,]" saw Mr. and Mrs. Hershey, and "I told them I needed help." *Id.* at 277.

A.2d 1154, 1158-59 (Pa. 1982) (trial court properly determined twelve-year-old witness was conscious of duty to testify truthfully, "notwithstanding his unfamiliarity with the specific word 'oath'"); Pa.R.E. 402 ("Evidence that is not relevant is not admissible."); *Commonwealth v. Laird*, 988 A.2d 618, 636 (Pa. 2010) ("the decision to admit or exclude evidence is committed to the trial court's sound discretion and its evidentiary rulings will only be reversed upon a showing that it abused that discretion").

### III. Eyewitness Identification Expert

Appellant next claims the trial court erred in denying his request to present the testimony of Suzanne Mannes, Ph.D., a cognitive psychologist and expert in the reliability of eyewitness identification, who would have testified to specific factors affecting perception and memory that may have influenced P.S.'s identification of appellant. Specifically, Dr. Mannes was prepared to testify that P.S.'s identification of appellant was "colored by stress and fear, by weapon focus, exposure time, cross-race identification, and lighting." Appellant's Brief at 37. Appellant notes in *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), this Court held expert testimony regarding eyewitness identification was no longer *per se* inadmissible in Pennsylvania, but is now admissible in the discretion of the trial court in cases where the Commonwealth's proof of identity is solely or primarily dependent upon eyewitness testimony.[13] Appellant argues the trial court erred in denying

---

[13] *Walker* involved two armed gunpoint robberies, which occurred within two weeks of each other against five victims who had never encountered the robber before. The victims separately identified Walker as the robber via photo arrays and lineups. He was arrested and charged with various crimes related to the two robberies, which were consolidated for a single trial. A jury acquitted Walker of all charges related to the first robbery, but convicted him of all charges related to the second.

his request for an expert in this case because "P.S.'s identification of [appellant], while not the sole evidence of [appellant's] guilt, was certainly a primary piece of evidence against him, and the only direct evidence against him." Appellant's Brief at 39-40.[14]

Additionally, appellant faults the trial court for characterizing the proposed testimony "as a 'request to present an expert to impeach the credibility of the sole eyewitness to the crime.'" *Id.* at 36, *quoting* Trial Court Op. at 3 (unpaginated original). Appellant asserts the *Walker* Court held expert testimony on psychological factors impacting eyewitness identification is not intended to opine or speak directly to the trustworthiness or reliability of a particular eyewitness. Instead, expert testimony regarding eyewitness identification makes jurors aware of some of the limitations eyewitness testimony may present, and "'provides jurors with education by which they assess for themselves the witness's credibility.'" *Id.* at 37, *quoting Walker* at 784.

The Commonwealth responds *Walker* removed the *per se* ban on expert testimony regarding eyewitness identification, in part due to the "use of DNA testing in overturning convictions based on eyewitness testimony[.]" Commonwealth's Brief at 20, *citing Walker*, 92 A.3d at 782-84. The Commonwealth notes *Walker* stands for the proposition that, generally, expert testimony regarding eyewitness identification is relevant "'where

---

[14] In support of this claim, appellant cites to the holding in *Commonwealth v. Selenski*, 158 A.3d 102 (Pa. Super. 2017), *appeal denied*, 170 A.3d 1056 (Pa. 2017), where the Superior Court applied *Walker*. In *Selenski*, the evidence of Selenski's guilt, beyond an eyewitness's identification, consisted of circumstantial evidence of items taken from his home and vehicle similar to items found at the crime scene. Appellant argues, "[t]o the extent that the Superior Court in *Selenski* held that virtually any other evidence was sufficient to render expert testimony regarding eyewitness identification inadmissible . . . *Selenski* has taken the general suggestion of *Walker* too far." Appellant's Brief at 38. As we denied *allocatur* in *Selenski*, and application of *Selenski* is unnecessary to the resolution of the current appeal in any event, we do not consider or further address appellant's suggestion the decision of the Superior Court in that matter was flawed.

the Commonwealth's case is **solely or primarily** dependent upon eyewitness testimony.'" *Id.*, *quoting Walker*, at 787 (emphasis added by Commonwealth). Here, the Commonwealth contends its case was not solely or primarily dependent upon the eyewitness testimony of P.S. because it "presented numerous pieces of evidence, independent of P.S.['s trial testimony] that established [appellant's] identity as the attacker." *Id.* at 21. The Commonwealth argues, in addition to P.S.'s testimony, its case also relied on the evidence of 1) the observed light in the appellant's residence coinciding with the location of the bathroom in which it appeared someone had very recently showered; 2) the discovery of latex gloves and camouflage cloth clogging the drain in that bathroom; 3) the washer containing "reddish brown bleach water" in which appellant's clothing was submerged; 4) the DNA match to H.S. of a blood stain on appellant's sneaker recovered from the bleach water, a finding not disputed by appellant's own DNA expert; and 5) the bloodhound tracking. *Id.* Similarly, the trial court concluded it did not abuse its discretion in denying the requested expert testimony because "there was a significant amount of other evidence, both physical and testimonial, that the Commonwealth presented." Trial Court Op. at 4 (unpaginated original).

In *Walker*, this Court noted "there is no doubt that wrongful conviction due to erroneous eyewitness identification continues to be a pressing concern[.]" 92 A.2d at 780. We determined that "[o]ne way in which fact finders may be assisted in making more accurate and just determinations regarding guilt or innocence at trial is through the admission of expert testimony [regarding eyewitness identification]." *Id.* Accordingly, we removed the *per se* ban on such evidence but recognized there are many "practical concerns to permitting such testimony[,]" including the possibility of its proliferation "in

numerous cases," as well as "the cost of allowing expert testimony, possible claims of ineffectiveness for failing to obtain an expert, and trials becoming a 'battle of the experts,' not only on questions of eyewitness identification, but also on related issues[.]" *Id.* at 787. Accordingly, we envisioned "that allowing such expert testimony would be limited to certain cases[,]" and that, generally, those cases "would be where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony." *Id.* We observed the eyewitness identifications of Walker were the only direct evidence of his guilt and were central to his conviction. *Id.* at 791.

Clearly, one of the concerns undergirding the decision in *Walker* is the fact that, in certain cases, an accused's guilt is determined by very little else than the testimony of an eyewitness. The case *sub judice* is simply not such a case. While we do not discount the importance of P.S.'s testimony at trial, appellant's identity as the perpetrator was established beyond a reasonable doubt by evidence establishing numerous facts, circumstances, and inferences pointing to him. The concerns regarding wrongful convictions based on the vagaries of eyewitness testimony that undergird *Walker* simply do not exist here. Indeed, the fact the blood discovered on appellant's shoe was a DNA match to one of the victims ameliorates any concern a later DNA test might exonerate appellant.

Accordingly, we determine this is not the type of case in which the primary evidence of guilt is the testimony of an eyewitness based on an encounter under circumstances in which the witness's memories and perceptions might be affected by psychological and experiential factors, an understanding of which could aid a jury in determining the accuracy and believability of the identification. Because appellant's guilt

and his identity as the perpetrator were established by many facts apart from P.S.'s eyewitness testimony, there was no need for expert testimony regarding eyewitness identification, and the trial court did not abuse its discretion in denying appellant's request to allow it.

## IV. Evidence of Potential Deportation

Appellant alleges the trial court erred in permitting the Commonwealth to introduce evidence of his potential deportation if convicted of the charges he sexually molested S.S. and H.S. to establish a motive for the killings. Although he concedes evidence of the charges themselves was relevant and admissible, appellant alleges, without any specific supporting argument, that the probative value of his potential deportation was outweighed by its prejudicial impact. He notes his potential deportation "was presented to the jury in the prosecutor's opening statement, his closing argument, and through the testimony of the prosecuting officer, Corporal Todd McCurdy." Appellant's Brief at 41.[15] Appellant's

---

[15] During his opening statement, the prosecutor remarked "[Appellant's] next Court appearance [regarding the sexual molestation charges] was June 26th of 2015. He was not going to just allow this to occur. He was not going to face the consequences, the potential consequences of those charges, which were extensive incarceration and the possibility of deportation. He was not going to allow that to occur." N.T. Trial, 6/7/17 at 31. During the prosecutor's examination of Corporal McCurdy, the following exchange took place:

> Q. [By the prosecutor] …And as part of your investigation here, did you determine what the defendant's immigration status is?
>
> A. [By the witness] Green card holder.
>
> Q. He's a green card holder. Did you determine if he was facing potential deportation if he was convicted in the sexual molestation case?

claim is grounded by the assertion his potential deportation was irrelevant and prejudicial because the Commonwealth never established appellant was even aware he could potentially be deported if convicted of the sexual molestation charges. "Without evidence that [appellant] was aware of the possibility of deportation, potential deportation simply could not have been a motive for the crimes." Appellant's Brief at 43.

The Commonwealth responds that the trial court enjoys broad discretion in admitting or excluding evidence and the evidence of appellant's immigration status and potential deportation were admissible to prove motive. Commonwealth's Brief at 22, *citing Commonwealth v. Philistin*, 53 A.3d 1, 17 (Pa. 2012) (evidence to prove motive is generally admissible; evidence of immigration status relevant and admissible to show defendant's motive to kill to avoid deportation even if "the Commonwealth emphasized other potential motives"). The Commonwealth asserts it is permissible to presume the holder of a green card is aware of deportation as a potential consequence of a criminal conviction. Moreover, the Commonwealth notes the references at trial to potential deportation were fleeting, and were presented in conjunction with other potential

---

A. Conviction of all charges, without getting into the specifics of those charges, would have resulted in deportation, potentially.

N.T., 6/12/17 at 661-62.

In his closing argument the prosecutor remarked, "That was his motive. He was getting rid of those witnesses. You heard that the next hearing [in the sexual molestation case] was going to be June 26th. . . . He was not going to allow that to happen. He was not going to sit by and let them convict him and face prison and potential deportation. He took matters into his own hands[.]" N.T., 6/13/17 at 835-36. Additionally, the prosecutor later said, "[Appellant's] goal was to go in and get rid of all these witnesses, get rid of his problem, get rid of the potential for prison, get rid of the potential for deportation. That was his goal." *Id.* at 861.

consequences that would flow from a conviction. Thus, the Commonwealth claims there was no abuse of discretion in permitting introduction of the evidence. Similarly, the trial court determined appellant's issue is meritless, because the challenged evidence was admissible to prove motive and was "not unduly prejudicial." Trial Court Op. at 5 (unpaginated original).

We first note, although appellant claims the prejudicial impact of the deportation evidence outweighed its probative value, he makes no targeted argument whatsoever describing the specific nature of the alleged prejudice. Appellant does not explain why the evidence was prejudicial, and he cites no authority in support. There is no self-evident prejudice here and the bare, unsupported claim the evidence was more prejudicial than probative is waived. *See Commonwealth v. Padilla*, 80 A.3d 1238, 1255 n.16 (Pa. 2013) (undeveloped claim neither explained factually nor supported by citations to law is unreviewable and waived), *citing Commonwealth v. Briggs*, 12 A.3d 291, 326 n.34 (Pa. 2011) (undeveloped claim waived). Moreover, to the extent this Court could even note expression of a view, unexpressed by appellant, of seemingly increased anti-immigrant attitudes generally in American society, we would nevertheless conclude the evidence of deportation in this case, even if prejudicial, was harmless error given, among other things, the overwhelming amount of properly introduced evidence of appellant's guilt and motive. *See Commonwealth v. Burno*, 154 A.3d 764, 787 (Pa. 2017) ("Harmless error exists if the state proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming

and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.") (citation omitted).

We are left only with appellant's alternative rationale — the evidence was irrelevant and erroneously admitted because the Commonwealth did not establish appellant was even aware of the possibility of deportation and thus, the threat of potential deportation could not have been a motive for his crimes. The Commonwealth presented evidence that appellant held a green card and could potentially be deported if convicted of the sexual charges he faced. These facts were used to undergird a possible motive for the murders among other possible motives. In *Philistin*, this Court considered whether evidence the appellant was an undocumented alien was irrelevant and prejudicial where the Commonwealth did not argue his immigration status and possible deportation was evidence of his motive to shoot two police officers. Nevertheless, this Court held "[the] appellant's immigration status was relevant to show he had a motive to shoot the officers, lest he be deported. This evidence is admissible as evidence of motive, even if the Commonwealth emphasized other potential motives." *Philistin*, 53 A.3d at 16-17. A trial court's decision to admit evidence of motive is subject to an abuse of discretion standard on appellate review. *Commonwealth v. Hairston*, 84 A.3d 657, 670 (Pa. 2014).

Here, although the Commonwealth presented evidence through the testimony of Corporal McCurdy that appellant was a green card holder who faced potential deportation, the Commonwealth presented no evidence appellant was aware of this potential consequence. For example, the Commonwealth did not present evidence potential deportation had been discussed with appellant in the sexual molestation proceedings or that appellant, at some other point, was informed deportation was a

potential consequence of his criminal conduct. Accordingly, while the Commonwealth's suggestion the holder of a green card is presumably aware deportation is a potential consequence of criminal conduct has some facial appeal (because a criminal defendant's motive is generally unexpressed and provable by inference only), we reject it under the facts of this case. There was no proper inference to be drawn between potential deportation and motive to commit the killings if appellant, in fact, did not know deportation was a potential consequence if convicted of the sexual charges. Nevertheless, to the extent the court erred and abused its discretion in allowing the evidence to be admitted absent a proper factual foundation, we determine the error is harmless. *Burno*, 154 A.3d at 787.

## V. Challenges to Pennsylvania's Death Penalty Statute

Appellant claims the trial court erred in denying his post-trial motion to strike the notice of death, because Pennsylvania's death penalty statute, 42 Pa.C.S. §9711, violates due process guarantees contained in the Fifth and Sixth Amendments to the federal Constitution, and "permits imposition of the death penalty without a finding beyond a reasonable doubt that the aggravating circumstances outweigh any mitigating circumstances, in violation of *Hurst v. Florida*, 136 S.Ct. 616 (2016), and *Ring v. Arizona*, 536 U.S. 584 (2002)." Appellant's Brief at 44-61, *additionally citing Apprendi v. New Jersey*, 530 U.S. 466 (2000) (any fact increasing defendant's sentence beyond statutory maximum is an element that must be submitted to jury). The Commonwealth responds that appellant's argument has been consistently rejected by this Court. Commonwealth's Brief at 23, *citing Commonwealth v. Roney*, 866 A.2d 351, 361 (Pa. 2005) (rejecting claim

Pennsylvania's death penalty statute is invalid because it provides no standards for jury to weigh aggravating and mitigating circumstances). The trial court responded in similar fashion. Trial Court Op. at 5 n.16 (unpaginated original) ("The Supreme Court of Pennsylvania has consistently rejected this argument."), *citing Roney* and *Commonwealth v. Bronshtein*, 691 A.2d 907 (Pa. 1997).[16]

In *Roney*, the defendant argued Pennsylvania's death penalty statute violates, *inter alia*, the Sixth Amendment because it does not require the jury to find the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. We denied relief noting, "this Court has consistently rejected the argument that the Pennsylvania death penalty statute is invalid because it imposes no standards by which the jury can weigh aggravating versus mitigating circumstances." 866 A.2d at 361, *citing Bronshtein* and *Zettlemoyer*, 454 A.2d 937. Subsequently, the defendant in *Commonwealth v. Sanchez*, 82 A.3d 943 (Pa. 2013), raised the identical argument raised in *Roney*, but asked this Court to reconsider *Roney* in light of *United States v. Gabrion*,

---

[16] In this case, the trial court instructed the jury the Commonwealth was required to prove each aggravating circumstance beyond a reasonable doubt and that by contrast mitigating circumstances need only be proved by a preponderance, and the jury could only return a death sentence if it unanimously found at least one aggravating circumstance and no mitigating circumstances, or that the aggravating circumstances outweighed the mitigating circumstances. N.T. 6/14/17 at 158-60. *See* 42 Pa.C.S. §9711(c)(1)(iii) (aggravating circumstances must be proven by the Commonwealth beyond a reasonable doubt, while mitigating circumstances can be proven by the defendant by a mere preponderance of the evidence); *see also* 42 Pa.C.S. §9711(c)(1)(iv) (allows sentence of death only where jury finds at least one aggravating circumstance and no mitigating circumstances, or finds aggravating circumstances outweigh mitigating circumstances). We recently noted this Court has repeatedly held these instructions pass constitutional muster. *Commonwealth v. Wholaver*, 177 A.3d 136, 172 (Pa. 2018) ("[T]his Court has previously rejected Appellant's claim that, pursuant to *Ring*, a trial court must instruct a jury that, to sentence a defendant to death, they must determine that the aggravators outweigh the mitigators beyond a reasonable doubt.), *citing Roney*, 866 A.2d at 358-61, and *Commonwealth v. Sanchez*, 82 A.3d 943, 985 (Pa. 2013).

648 F.3d 307 (6th Cir. 2011), where an analogous provision of the Federal Death Penalty Act of 1994, 18 U.S.C.S. §§3591-3599, was initially held by a federal circuit panel to be unconstitutional under *Apprendi* and *Ring*. We declined to reconsider our determination in *Roney*, however, noting a subsequent decision by the Sixth Circuit, *en banc*, ultimately concluded the reasonable doubt standard does not apply to the weighing of aggravating and mitigating factors because the weighing process is not a factual determination, but rather a "complex moral judgment." *Sanchez*, 82 A.3d at 985, *citing United States v. Gabrion*, 719 F.3d 511, 532 (6th Cir. 2013) (*en banc*). Thus, we held in *Sanchez* that our decision in *Roney* was controlling, and later reaffirmed that position in *Commonwealth v. Wholaver*, 177 A.3d 136 (Pa. 2018).

Here, appellant does not cite to or discuss *Wholaver*, which reinforced the vitality of *Roney*. Instead, appellant claims *Roney* and *Bronshtein*, a case upon which the *Roney* Court relied, must be "reexamined in light of *Hurst*[.]" Appellant's Brief at 45. To that end, appellant asserts that *Hurst* "clarified for the first time that, where the weighing of facts in aggravation and mitigation is a precursor to a death sentence, the Sixth Amendment requires the State to prove, to a jury, **beyond a reasonable doubt**, that aggravating circumstances outweigh mitigating circumstances." *Id.* at 45-46, *citing Hurst*, 136 S.Ct. at 621-22 (emphasis supplied by appellant).

Appellant misreads *Hurst*. Succinctly, *Hurst* held unconstitutional a Florida death penalty statute that required a judge to hold a separate hearing after a jury had rendered an "advisory verdict." 136 S.Ct. at 620-21. The High Court determined the sentencing scheme violated the Sixth Amendment because it required a judge, as opposed to a jury, to make the critical findings necessary to impose a sentence of death. The Pennsylvania

death penalty statute has no analogous provision. Moreover, contrary to appellant's suggestion, *Hurst* does not, explicitly or implicitly, require a jury to determine that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Appellant's claim in this regard has no merit, and we conclude the trial court did not err in denying his post-trial motion to strike the notice of death.

## VI. Statutory Review of Death Sentence

Although appellant does not raise this issue on appeal, we are required by statute to conduct an independent review of the record to determine whether the sentences of death were (i) the product of passion, prejudice, or any other arbitrary factor; or (ii) if the evidence fails to support the finding of at least one aggravating circumstance set forth in 42 Pa.C.S. §9711(d). *See* 42 Pa.C.S. 9711(h)(1), (3) (sentence of death subject to automatic review by this Court, which shall affirm unless it concludes either enumerated factor is present); *Hicks*, 156 A.3d at 1129.

We have reviewed the entire record and hold appellant's sentences of death were not the product of passion, prejudice, or any other arbitrary factor. The sentences were based on properly admitted evidence appellant illegally entered the basement residence of the victims, who were potential prosecution witnesses against him in a pending sexual assault case, and intentionally stabbed them to death. The evidence was sufficient to support the following aggravating factors beyond a reasonable doubt as to each victim: (1) the victim was a prosecution witness to a felony committed by appellant "and was killed for the purpose of preventing [her] testimony" against him, 42 Pa.C.S. §9711(d)(5); (2) the killing was committed in the perpetration of a felony, *id.* at §9711(d)(6); (3)

appellant "knowingly created a grave risk of death to another person in addition to the victim[,]" *id.* at §9711(d)(7); (4) appellant was "convicted of another murder . . . either before or at the time of the offense at issue[,]" *id.* at §9711(d)(11); and (5) at the time of the killing appellant was subject to a court order restricting his behavior toward the victim, designed to protect the victim from appellant, *id.* at §9711(d)(18). The jury found two mitigating circumstances by a preponderance of the evidence: (1) appellant has no significant history of prior criminal convictions, 42 Pa.C.S. §9711(e)(1); and (2) the "catch-all" mitigator, *id.* at §9711(e)(8), and found the aggravating circumstances outweighed the mitigating circumstances.[17]

As the jury found the aggravating circumstances outweighed the mitigating circumstances, the death sentences imposed comply with the statutory mandate and there are no grounds upon which to vacate the sentences of death. Accordingly, we affirm appellant's convictions and sentences of death.

The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with 42 Pa.C.S. §9711(i).

Chief Justice Saylor and Justices Baer, Todd, Donohue and Mundy join the opinion.

Justice Wecht files a concurring opinion.

---

[17] Under the "catch-all" subsection which permits the jury to consider "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense[,]" 42 Pa.C.S. §9711(e)(8), the verdict sheet for both murder cases listed 19 circumstances that were potentially mitigating. The jury indicated "one or more of us" found 17 of those 19 circumstances applicable, but unanimously determined the aggravating circumstances outweighed the mitigating circumstances in both cases.