J-S43027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RUSSELL WATSON | : | |
| | : | |
| Appellant | : | No. 1457 EDA 2024 |

Appeal from the Judgment of Sentence Entered May 16, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009079-2019

BEFORE: KUNSELMAN, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.: **FILED MARCH 12, 2026**

Russell Watson appeals from the judgment of sentence imposed following his convictions for rape, possession of a firearm prohibited, and possession of an instrument of crime.[1] Watson challenges the constitutionality of his firearms conviction and rulings on evidentiary issues. We affirm.

Watson was charged after the victim, A.B., reported that she had been threatened with a gun and raped. The charge of possession of firearm prohibited was predicated on Watson's prior conviction for possession with intent to deliver ("PWID"). Watson moved before trial to dismiss that charge for alleged violations of the Second Amendment and the Equal Protection Clause of the U.S. Constitution and corresponding provisions of the Pennsylvania Constitution. The trial court denied the motion.

---

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 6105(a)(1), and 907(a), respectively.

The trial court accurately summarized the trial evidence and procedural history as follows:

> The trial began on January 18, 2024. A.B., who was 21 years old at the time of trial, was the Commonwealth's first witness. On direct examination, she testified that in October 2019, she was living with her grandmother and aunt in the same Philadelphia neighborhood where [Watson] lived. She had met [Watson] in passing in the neighborhood. N.T. 1/18/24 at 44:25-47:9. A.B. admitted that she had run away from home in the past. *Id.* at 48:17-21. A few days before the incident, she had left home without permission, stayed out past curfew, and gone to stay with her boyfriend in a nearby town. *Id.* at 47:15-48:25. She returned to her neighborhood late at night on October 23, [2019] so far past her curfew that she was not sure whether her family would open the door to her. *Id.* at 49:1-24, 58:1-14. She found herself stranded outside a brightly lit Chinese restaurant, messaging friends to find a place to stay, with her phone dying, and a group of men crowding around and hassling her. *Id.* at 50:3-53:23.
>
> At that point, A.B. testified, [Watson] approached her, chased off the group of men, and offered to buy her a meal and let her charge her phone at his home. *Id.* at 53:24-55:8. A.B. accepted the invitation. Once they arrived at [Watson's] house, he pulled out a gun and placed it on the table. *Id.* at 62:4-8. After they watched a movie, [Watson] asked A.B. to come upstairs, and she went, feeling that she didn't have a choice. *Id.* at 65:1-6, 66:1-9. [Watson] then became angry with A.B., pulled a gun from under the bed, and told A.B. to take her clothes off. *Id.* at 73:4-8, 73:18-20. A.B. initially dissuaded him, but eventually he picked up the gun again and raped her with the gun to the back of her head. *Id.* at 78:24-86:10. [Watson] then went to sleep. At dawn, A.B. snuck out of [Watson's] house, returned to her home, and fell asleep on the front steps. *Id.* at 86:9-89:3.
>
> On cross examination, A.B. admitted that before the night in question she had run away from home around 20 times, that her family had reported her as a missing person every time, that she believed her father might take away her phone or certain communications apps as punishment

- 2 -

for running away, and that she was worried that she wouldn't be permitted to speak to her boyfriend any more. *Id.* at 105:1-21, 141:4-145:15. She acknowledged that although she had testified on direct examination that she told [Watson] that she was 17 years old, *id.* at 64:7-8, she might have told him that she was 18. *Id.* at 114:7-22. A.B. agreed that she and [Watson] smoked marijuana together while watching the movie at his house. *Id.* at 117:17-119:4. Defense counsel asked A.B. several times whether she had offered sexual services to [Watson] for money, and she denied doing so. *Id.* at 115:23-116:6, 122:12-22, 133:5-12 . . .

A.B. testified that after she went to sleep on the steps of her home on the morning of October 24, 2019, her aunt and grandmother came out of the house on their way to a prayer study at her uncle's house. *Id.* at 89:14-24. Without asking her what had happened, they took her to the prayer study and told her to take a shower, which she did. *Id.* at 89:14-91:5. After the prayer study, in the car, A.B. asked them, "if someone did something to somebody, should I tell?" *Id.* at 92:8-23. They pressed her for more information, and A.B. told them about the rape. *Id.* at 92:12-93:2. Her family took her to the hospital for a rape kit examination, and she went to the Special Victims Unit. *Id.* at 92:24-94:11.

A.B.'s aunt [("Aunt")] testified that on the morning of October 24, A.B. "seemed very upset, and . . . she looked tired. She looked ragged. She looked different from herself. She looked like she kind of came back from war . . . She looked really down." *Id.* at 154:22-155:1. She explained that she had been alarmed at A.B.'s question – which she described as, "if someone does something bad, is it capable for them to do it again to someone else?" – that she had asked A.B. what had happened, and that A.B. had told her about the rape. *Id.* at 156:9-157:7. The Commonwealth introduced evidence that A.B. visited Lankenau Hospital on October 24, 2019, and was examined at the Philadelphia Sexual Assault Response Center in the early morning hours of October 25. *Id.* at 159:12-160:1; Exs. C16, C20. Philadelphia Police Officer Kyle Leyer testified that he spoke with A.B. while she was in the hospital on October 24. She seemed "pretty calm," he said, until he asked her the details of what had happened; at that point, she got "visibly upset" and started crying loudly. N.T. 1/22/24 at 6:6-7:15. The

Commonwealth played a minute and twenty seconds of Officer Leyer's body-worn camera video, which showed A.B. crying and screaming. ***Id.*** at 7:11-8 :23; Ex. C8 . . .

On January 23, 2024, the jury returned a mixed verdict. It found [Watson] guilty of Rape by Forcible Compulsion and Possessing Instruments of Crime and not guilty of the remaining charges on the verdict sheet (Unlawful Restraint, False Imprisonment, Unlawful Contact With Minor, and Corruption of Minors). N.T. 1/23/24 at 28:16-32:9.

After the jury verdict, this Court held a waiver trial on the Section 6105 charge [of possession of a firearm prohibited.] ***Id.*** at 32:18-34:9. The Commonwealth introduced a certified copy of a court record showing that [Watson] had pled guilty to a cocaine [possession with intent to deliver "PWID")] on October 8, 2010. This Court found [Watson] guilty of the Section 6105 charge. ***Id.*** at 32:18-39:7, Ex. C29.

Trial Court Opinion, filed 8/1/24, at 6-8.

The trial court sentenced Watson to eight and one-half to 17 years' incarceration on the rape charge, six to 12 years' incarceration on the possession of a firearm prohibited charge, and no further penalty on the possession of an instrument of crime charge. This timely appeal followed.

Watson raises the following issues:

1. Did the trial court err in denying Watson's Motion to Dismiss Possession of a Firearm by a Prohibited Person?

2. Did the trial court err in precluding relevant evidence of A.B.'s escalating punishment and motive to fabricate?

3. Did the trial court err in allowing speculative and improper lay opinion testimony?

4. Did the trial court err in admitting prejudicial and inadmissible body-worn camera footage?

Watson's Br. at 4 (trial court answers omitted).

Watson first challenges the court's denial of his pre-trial motion to dismiss the possession of a firearm prohibited charge. Watson concedes that he has a prior conviction for PWID, which is an enumerated offense under Section 6105 of the Crimes Code rendering him statutorily ineligible to possess a firearm. *Id.* at 9. However, he argues that Section 6105 "unconstitutionally infringes on Watson's rights to bear arms by imposing a lifetime firearm ban based on a non-violent conviction, without support in historical tradition" and "violates his right to equal protection as the statute does not survive strict scrutiny." *Id.* at 8. He emphasizes that his prior conviction for PWID is "not a crime of violence and does not fall within the Nation's historical tradition of firearm regulation." *Id.* at 13. In Watson's view, Section 6105's "blanket prohibition infringes on the constitutional rights of individuals with non-violent convictions and criminalizes conduct protected by the Second Amendment." *Id.*

The constitutionality of a statute "is a question of law for which our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Farmer***, 329 A.3d 449, 451 (Pa.Super. 2024), *appeal granted*, 343 A.3d 180 (Pa. 2025). "The Second Amendment governs the people's right to keep and bear arms: 'A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.'" *Id.* at 451-52 (quoting U.S. Const. amend II). "[T]he laws of our General Assembly are presumed to be constitutional, and . . . one who challenges a law's constitutionality bears a heavy burden to demonstrate

- 5 -

that the law 'clearly, palpably, and plainly violates the constitution.'" ***Id.*** at 455 n.5 (quoting ***Commonwealth v. Eid***, 249 A.3d 1030, 1041 (Pa. 2021).

Section 6105 of the Crimes Code restricts persons from possessing, using, manufacturing, controlling, selling, or transferring firearms, if they have been previously convicted of at least one enumerated offense:

> (1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1). Subsection (c) of Section 6105 forbids firearm possession by "[a] person who has been convicted of an offense under . . . The Controlled Substance, Drug, Device and Cosmetic Act, or any equivalent Federal statute or equivalent statute of any other state, that may be punishable by a term of imprisonment exceeding two years." 18 Pa.C.S.A. § 6105(c)(2). The parties in the instant case do not dispute that Watson's prior PWID conviction rendered him subject to Section 6105's firearm prohibition.

This Court, in ***Commonwealth v. Randolph***, 343 A.3d 1248 (Pa.Super. 2025), recently addressed the same Second Amendment challenge to Section 6105 that Watson raises.[2] There, like Watson, the appellant was convicted of violating Section 6105 based on prior PWID convictions. ***Randolph***, 343 A.3d at 1250. Prior to the trial, the appellant, like Watson, filed a motion to dismiss

---

[2] The decision in ***Randolph*** was filed on July 31, 2025, approximately one month after Watson filed his appellate brief.

the persons not to possess a firearm charge arguing that Section 6105 "was unconstitutional insofar as it violated his right to bear arms pursuant to the Second Amendment of the United States Constitution." *Id.* After reviewing the historical progress of relevant cases, this Court held that Section 6105 as applied to the appellant was constitutional. We explained:

> Based upon our review of the jurisprudence, including the Supreme Court's most recent discussion in [*United States v. Rahimi*, 602 U.S. 680 (2024)], we conclude that the prohibition imposed on [the a]ppellant by § 6105 "is consistent with the Nation's historical tradition of firearm regulation." [*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)]. As noted, the *Rahimi* Court stated that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. at 702, 144 S.Ct. 1889. Here, the trial court specifically found that [the a]ppellant's prior convictions for PWID placed him in the category of persons who would pose a credible threat to others. This was supported by the Commonwealth's argument at the hearing. *See* N.T. Hearing, 8/8/23, at 16 ("[D]rug trafficking is inherently a violent offense. It indicates a willingness on the part of the drug trafficker to defend his business by any means necessary, and most drug dealers do possess firearms.").
>
> Our position is consistent with the U.S. Supreme Court's repeated admonition that [*D.C. v. Heller*, 554 U.S. 570 (2008)] and its progeny "should [not] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. Moreover, as numerous courts have recounted in their opinions, categories of people have historically been disarmed despite not having actually engaged in violent behavior. *See, e.g.*, [*United States v. Jackson*, 110 F.4th 1120, 1126-27 (8th Cir. 2024)] (discussing colonial regulations that prohibited certain classes of persons from owning firearms, such as those who fail to swear a loyalty oath); *see also* [*Commonwealth v. Jenkins*, 328 A.3d

1076, 1092 (Pa.Super. 2024)] (highlighting firearms prohibitions relating to sureties and vagrants).

\*\*\*

In reaching this decision, we necessarily conclude that [the a]ppellant's arguments to the contrary are unpersuasive. Although he devotes a significant portion of his brief to describing that PWID is not a "crime of violence," that contention is unavailing since "crime of violence" is not the term utilized by the U.S. Supreme Court throughout its recent case law. Instead, the **Rahimi** Court highlighted that firearm prohibitions may apply to those that pose a "credible threat" to the safety of another. Drug traffickers fit that mold.

**Id.** at 1258-59. This Court further rejected the appellant's facial constitutional challenge to Section 6105. **Id.** at 1260-61. We thus upheld the constitutionality of Section 6105 and affirmed the appellant's judgment of sentence.[3]

**Randolph** is indistinguishable to the instant case and therefore controls our outcome. We therefore conclude that, as applied to Watson, the firearm restriction under Section 6105 does not violate his constitutional right to bear arms under state or federal law.[4]

_____

[3] We note that on September 1, 2025, the appellant in **Randolph** filed a petition for allowance of appeal with our Supreme Court at Docket No. 217 WAL 2025. On January 23, 2026, our Supreme Court issued an order holding the petition pending disposition of **Commonwealth v. Farmer**, 41 MAP 2025, and **Commonwealth v. Jenkins**, 42 MAP 2025.

[4] This Court has issued several recent unpublished decisions addressing the same issue as in the instant case. Those decisions applied the holding of **Randolph** and found that Section 6105's firearm prohibition does not violate the constitutional right to bear arms. **See**, **e.g.**, **Commonwealth v. Phillips**, No. 248 MDA 2025, 2026 WL 266542, \*5 (Pa.Super. filed Feb. 2, 2026) _(Footnote Continued Next Page)_

Watson next claims that Section 6105 violates his equal protection rights. He argues that the right to bear arms is a fundamental right, which triggers the "strict scrutiny" standard in equal protection claims and "Section 6105 cannot withstand strict scrutiny." Watson's Br. at 16-17. Watson maintains that "[t]he Commonwealth failed to demonstrate that the statute is narrowly tailored to serve a compelling interest." *Id.* at 17. In his view, "there is no basis for categorically denying firearm rights to individuals convicted of non-violent offenses" and "[g]eneralized public safety concerns do not justify such a broad and untailored restriction." *Id.* at 17-18.

"The concept of equal protection requires that uniform treatment be given to similarly situated parties." *Commonwealth v. Grove*, 170 A.3d 1127, 1145 (Pa.Super. 2017) (citation omitted). "The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, and does not require equal treatment of people having different needs." *Id.* (citation omitted). "[A] classification must rest upon some ground of difference which justifies the classification and has a fair and substantial relationship to the object of the legislation." *Id.* (citation omitted).

_____

(unpublished mem.); *Commonwealth v. Purdie*, No. 2651 EDA 2024, 2025 WL 3633230, at *8 (Pa.Super. filed Dec. 15, 2025) (unpublished mem.); *Commonwealth v. Megenhardt*, No. 1688 MDA 2024, 2025 WL 3281510, at *7 (Pa.Super. filed Nov. 25, 2025) (unpublished mem.); *Commonwealth v. Easley*, No. 1267 WDA 2024, 2025 WL 3090087, at *6 (Pa.Super. filed Nov. 5, 2025) (unpublished mem.).

In **Grove**, this Court determined that Section 6105 does not violate equal protection. We explained that "Section 6105 applies across the board to any and all violators: a person convicted of an enumerated offense shall not possess a firearm." **Id.** at 1146. We emphasized that Section 6105 "does not carve out classifications or single out any distinct class of persons for unequal treatment, but by its terms applies equally to all persons" convicted of an enumerated offense. **Id.** (citation and internal quotation marks omitted). We further noted that "recasting" an argument that Section 6105's prohibition of gun ownership violated the right to bear arms as an equal protection claim "cannot salvage" the claim. **Id.** at 1147.

Here, Watson attempts to recast his Second Amendment claim as an equal protection claim. Since we have found that his Second Amendment claim is without merit, Watson's claim fails.[5]

Watson next argues that the court erred in precluding relevant evidence of A.B.'s escalating punishment and motive to fabricate. Watson's Br. at 18. During cross-examination of A.B., the court sustained the Commonwealth's objection to the question, "And you came to Philadelphia at some point to reside with your father's side of the family partially because of [the] fact you

---

[5] Relying on **Commonwealth v. Sumpter**, 340 A.3d 977, 984 (Pa.Super. 2025), Watson argues that the right to bear arms is a fundamental right and the Commonwealth thus must establish that the statute is narrowly tailored to serve a compelling interest under the strict scrutiny standard. **See** Watson's Br. at 17. However, **Sumpter** dealt with an equal protection challenge to Section 6108 (carrying firearms on public streets or public property in Philadelphia). It did not address Section 6105, the applicable statute here. **Sumpter** affords Watson no relief.

- 10 -

kept running away in Connecticut, correct?" Watson argues that the court's ruling was erroneous because the question "was relevant to establish that A.B. was sent to live with her father as punishment for repeatedly running away from her mother." *Id.* (citation to reproduced record omitted). In Watson's view, "[t]hat relocation marked an escalation in discipline, which continued in Philadelphia where her father confiscated her phone and restricted contact with her boyfriend." *Id.* He stresses that A.B. ran away again in October 2019, when the instant incident occurred, and maintains that A.B. "feared harsher punishment when she returned home." *Id.* at 19. According to Watson, "[t]his fear provided a motive for A.B. to fabricate the rape: to justify her absence, deflect blame, and garner sympathy." *Id.* Watson claims that by excluding the question, the court prevented Watson from presenting a narrative about A.B.'s motive to lie. *Id.*

"We review rulings on the scope of cross-examination for abuse of discretion." *Commonwealth v. Gross*, 241 A.3d 413, 420 (Pa.Super. 2020) (citation omitted). "An abuse of discretion is present where there is an overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Lynch*, 242 A.3d 339, 350 (Pa.Super. 2020) (citation and internal quotation marks omitted).

Here, the trial court explained its ruling as follows:

> During his cross-examination of A.B., defense counsel asked, "And you came to Philadelphia at some point to reside with your father's side of the family partially because

- 11 -

of [the] fact you kept running away in Connecticut, correct?" [N.T., 1/18/24,] at 141:17-20. This Court sustained the Commonwealth's objection and defense counsel requested a sidebar, which was held off the record. ***Id.*** at 141:21-142:3. After the sidebar, this Court directed defense counsel [on the record] to rephrase his question, and defense counsel asked a number of questions about whether A.B. had run away from her mother's home in Connecticut, which of her parents was more strict, and how her father had punished her for running away in the past. ***Id.*** at 141:23-145:15.

The sidebar was not transcribed. Neither the [c]ourt nor defense counsel sought to summarize it once the jury was out of the room, and [Watson] has not followed the Statement in Absence of Transcript procedures set forth in Pa.R.A.P. 1923. Accordingly, while this [c]ourt cannot rule out the possibility that it precluded questioning on some subject, it seems most likely that defense counsel explained at sidebar what he was seeking to elicit and this [c]ourt permitted him to continue. To the extent that this [c]ourt precluded defense counsel from pursuing any topic, it was defense counsel's responsibility to make an offer of proof. Pa.R.Evid. 103(a)(2). Because defense counsel did not do so, he has not preserved this issue.

Trial Ct. Op. at 22-23.

A review of the record supports the court's analysis. The record indicates that the court permitted defense counsel to elicit testimony about the victim's history of running away and fear of punishment, including her history of running away from home in Connecticut. On cross-examination, A.B. testified without objection that while living with her mother in Connecticut, she had run away "a number of times" and then went to live with her father in Philadelphia. N.T., 1/18/24, at 141-42. She stated that she had previously run away from home approximately 20 times. ***Id.*** at 105. She further testified that on the night of the incident, when she returned to Philadelphia after

staying with her boyfriend for a few days, she was "scared" to go home. *Id.*
at 109. A.B. stated that her father had taken away her phone and deleted
some communication apps in the past as punishment for running away. *Id.* at
143-44. She was also worried that her father might forbid her from speaking
to her boyfriend anymore and that she was concerned that her actions would
cause her grandmother "disappointment." *Id.* at 144-45. The defense thus
had sufficient opportunity to elicit testimony from A.B. about her alleged
"escalating punishment and motive to fabricate," and did elicit such testimony.
*See* Watson's Br. at 18. We find no abuse of discretion.

Watson next argues that the court erred in allowing "speculative and
improper lay opinion" testimony by victim's aunt. Watson's Br. at 19. During
direct examination of Aunt, the Commonwealth asked Aunt how A.B. appeared
after disclosing the rape. Aunt responded that A.B. "looked lost . . . like
something was taken from her." *Id.* at 19 (citation omitted; alteration in
brief). Defense counsel objected to the testimony, and the trial court overruled
the objection. Watson argues that the court's ruling was error because Aunt's
testimony "lacked foundation and was speculative." *Id.* at 20. He points out
that Aunt "had no personal knowledge of the incident as she was not present
when the assault allegedly occurred" and "her statement was not an
observable description of A.B.'s demeanor, but rather a subjective
interpretation that lacked any rational basis tied to personal perception." *Id.*
In Watson's view, "[t]he trial court's admission of this evidence allowed the

jury to draw an emotional inference unsupported by competent evidence and thus constituted error." ***Id.***

"The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion." ***Commonwealth v. Poplawski***, 130 A.3d 697, 716 (Pa. 2015).

Pursuant to Pennsylvania Rule of Evidence 701, lay witness testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701. A lay witness "may testify to distinct facts observed by him concerning the apparent physical condition or appearance of another." ***Commonwealth v. Counterman***, 719 A.2d 284, 301 (Pa. 1998).

Here, Aunt did not testify that she had personal knowledge that the incident occurred. Rather, Aunt's testimony was about A.B.'s demeanor and was based entirely on her personal observation. This was permissible lay opinion testimony. The trial court thus did not abuse its discretion in permitting the challenged testimony.

In his final issue, Watson argues the court erred in admitting the body-cam footage worn by Officer Leyer when he spoke to A.B. at the hospital on the night in question. Watson maintains that the video was cumulative

because the jury had already heard from A.B. and Officer Leyer "describing their interaction and A.B.'s demeanor." Watson's Br. at 21. He also asserts that any probative value of the footage was outweighed by unfair prejudice because "[t]he video depicted A.B. hysterical while describing the alleged assault, which created a risk of inflaming the jury's emotions and improperly bolstering her credibility." *Id.* Watson further argues that the video contained inadmissible hearsay because A.B.'s statement to Officer Leyer was "offered to show that the rape actually happened." *Id.*[6]

Pursuant to Pennsylvania Rule of Evidence 403, a "court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Unfair prejudice "means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id.* at cmt. Cumulative evidence is "additional evidence of the same character as existing evidence and that supports a fact established by the existing evidence." ***Commonwealth v. Flamer***, 53 A.3d 82, 88 n.6 (Pa.Super. 2012) (citation omitted).

Hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(2).

_____

[6] Watson no longer claims that the video was not relevant. ***See*** Watson's Br. at 20 n.20.

Here, the court determined that the body cam footage was admissible. It explained:

> The video was not cumulative; although both the officer and A.B.'s aunt testified that [A.B.] seemed upset, the video allowed the jury to see her demeanor for itself and decide whether it was more consistent with someone who had just suffered a trauma or someone who was cynically inventing a story. The video also was not hearsay, because it was not offered for the truth of whatever A.B. was saying . . .; it was offered to show her demeanor. Pa.R.Evid. 801(c)(2). Finally, the video was not unfairly prejudicial. It was not graphic, and the Commonwealth only played a short portion of it (less than 90 seconds) for the jury. All the video showed was that A.B. was very upset. This is not the kind of evidence that has "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.Evid. 403, cmt.

Trial Ct. Op. at 24-25.

Upon review, we find that the trial court did not err in admitting the video. The video was not cumulative because it showed the jury A.B.'s actual demeanor on the day of the incident, rather than hearing about it from other witnesses. Further, the video's probative value outweighed any alleged unfair prejudice. The main issue at trial was whether A.B. fabricated the rape. The video showed A.B.'s emotional state while reporting the rape to the police on the day it occurred. Lastly, the video was not inadmissible hearsay because it was not being offered to show that a rape occurred but rather to show A.B.'s emotional response when Officer Leyer asked her what had happened. Watson's final claim is without merit, and we therefore affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/12/2026